100 N.J. Super. 540 (1968)
242 A.2d 675
DEPARTMENT OF HEALTH, STATE OF NEW JERSEY, PLAINTIFF,
v.
PASSAIC VALLEY SEWERAGE COMMISSION, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided April 24, 1968.
Addendum to Opinion May 1, 1968.
*542 Mr. Theodore A. Schwartz, Deputy Attorney General, for plaintiff (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
Mr. Thomas E. Durkin, Jr. for defendant.
MINTZ, J.S.C.
This matter is on an order to show cause why defendant Passaic Valley Sewerage Commission (hereinafter the "Commission") should not be directed to comply with orders of plaintiff Department of Health (hereinafter the Department). The Department issued two directives ordering defendant to improve its sewage treatment facilities so that its effluent, which is pumped through an outfall line into Upper New York Bay near Robbins Reef Light, will be less harmful to these New Jersey waters. Pursuant to N.J.S.A. 58:12-4 the Department has sued for summary injunctive relief. The Commission contends that the Department has no jurisdiction over it or its treatment and pumping plant at Wilson Avenue adjacent to Newark Bay in the City of Newark.
The Department's initial directive, issued April 25, 1965, ordered defendant Commission to install post-chlorination equipment for the disinfection of its effluent at its Newark Bay plant for the period May 15, 1967 to September 15, 1967 and for said periods in succeeding years. In this connection, pursuant to the State Public Sanitary Sewerage Facilities Assistance Act of 1965 (N.J.S.A. 26:2E-1), plaintiff issued to defendant a $20,000 grant in September 1965 for a project feasibility study.
An amended directive, issued March 31, 1967, repeats the Department's demand, which had gone unheeded, for the installation of post-chlorination equipment, and further orders the Commision to effect a substantial improvement of its effluent treatment. The Department therein prescribes that on or before October 30, 1970 the Commission must *543 achieve a minimum 80% reduction in the biochemical oxygen demand (B.O.D.) of the sewage discharged from its plant into Upper New York Bay. Paragraph 2 of this order also requires the Commission to file a report for the Department's review and approval on or before October 1, 1967 regarding the proposed basis of the design of additions and alterations to its sewage treatment plant. Defendant has likewise failed to comply with this amended order.
Plaintiff contends that the Legislature's broad delegation of water pollution control authority to the Department in N.J.S.A. 58:12-2 and 3 and N.J.S.A. 26:1A-37(i) confer sufficient jurisdiction to it over defendant Commission to validate the instant administrative orders.
N.J.S.A. 58:12-2 in part provides:
"The State Department of Health * * * shall investigate the various methods of sewage disposal in order that it may be able to make proper recommendations in regard thereto, shall require alterations, additions or improvements to sewage treatment works, shall investigate all complaints of pollution of the waters of this State which shall be brought to its notice, and may inspect any of the waters of this State.
If the department finds that any of said waters are being polluted in such manner as to cause or threaten injury to any of the inhabitants of this State, either in their health, comfort or property, or that any sewage treatment works are inadequate in capacity or unit design to properly care for, treat and dispose of sewage before an effluent from such works is discharged into any of said waters, it shall notify in writing any person, corporation or municipality found to be polluting said waters or owning, operating or controlling, separately or jointly, any such inadequate sewage treatment works, that prior to a time to be fixed by the department, which time shall not be later than five years from the date of the notice, the person, corporation or municipality polluting said waters must cease such polluting and make such disposition of its sewage and other polluting matter as shall be approved by the department. Such person, corporation or municipality owning, operating or controlling inadequate sewage treatment works as aforesaid must alter, add to or improve such works in order that the sewage being received therein shall be cared for, treated and disposed of, and the effluent discharged into said waters in a manner approved by the department. * * *"
*544 N.J.S.A. 58:12-3 in part provides:
"Except under such conditions as shall be approved by the department, no person, corporation or municipality shall build any sewer, drain or sewerage system from which it is designed that any sewage or other harmful and deleterious matter, solid or liquid, shall flow into any of the waters of this state, or build, cause to be built or operate any plant for the treatment of sewage or other polluting substance from which the effluent is to flow into any of such waters, or, after the date specified in the notice provided for by section 58:12-2 of this title, permit any sewage or other polluting matter to flow into such waters from any sewer, drain or sewerage system under its control. * * *"
N.J.S.A. 26:1A-37(i) provides that the Department shall supervise sanitary engineering facilities and in the exercise of such supervision make and enforce rules and regulations concerning plans and specifications for construction or improvement of sewerage systems and disposal plants for the treatment of sewage. As the waters of Upper New York Bay, into which the Commission's effluent is discharged, are within the Department's jurisdiction, N.J.S.A. 58:12-1, the Department urges that defendant's sewage treatment facilities are necessarily subject to plaintiff's orders.
As earlier noted, defendant Passaic Valley Sewerage Commission operates a sewage treatment plant in the City of Newark. This plant provides treatment for 28 municipalities or portions thereof in four counties who have jointly contracted for these services with the Commission. Through its outfall line into the New Jersey waters of Upper New York Bay, the said plant discharges approximately 200 mgd (million gallons per day) of sewage effluent. It is estimated that this discharge contains a residual pollution load "equivalent to [that] contributed by the discharge of raw sewage for a population of 3.5 million people."
The Passaic Valley Sewerage District and Commission was originally created under L. 1902, cc. 48-49. The statutory provisions dealing with the District and Commission are to be found in N.J.S.A. 58:14-1 to 58:34.30. This statute (chapter 14) established a 5-member operating board  a *545 "body politic and corporate"  authorized to coordinate the planning and financing of sewage disposal and water pollution control in the Passaic Valley Sewerage District. N.J.S.A. 58:14-2, 3. The discharge, directly or indirectly, of sewage or other polluting matter "into the waters of the Passaic river at any point between the Great falls in the City of Paterson and the mouth of said river at Newark Bay" or into the waters of its tributaries is prohibited. N.J.S.A. 58:14-7. The commissioners, or others injured by such discharges, may sue in the name of the commissioners to enforce this prohibition. N.J.S.A. 58:14-7, 33. In the ordinary course, projects for the District are initiated with a request from an appropriate municipal body to the commissioners for the preparation of plans and estimates for the construction of sewer lines and treatment plants. N.J.S.A. 58:14-9, 10, 11. Any municipality in the district may contract with others and with the Commission for the "construction, maintenance and operation" of sewers, plants and works. N.J.S.A. 58:14-12. The statute further provides a formula for cost apportionment among the contracting municipalities. N.J.S.A. 58:14-13. A contracting municipality finances projects by raising taxes or by borrowing "upon its notes or other temporary obligation" or by issuing permanent bonds. A municipality may not incur indebtedness for these purposes which exceeds 5% of its tax ratables. N.J.S.A. 58:14-23. For moneys required by the commissioners in the performance of a contract, they too may borrow upon their corporate notes or other obligations, N.J.S.A. 58:14-24, but may not mortgage or encumber any part of the sewerage system. N.J.S.A. 58:14-34.21.
The Commission contends that N.J.S.A. 58:12-2 and 3 do not vest any authority in the Department to control its operations. It bases its exemption, inter alia, on the concluding section in Title 58, chapter 12, which provides:
"The provisions of this chapter shall in no way affect or modify the provisions of any law conferring power and authority upon the Passaic valley sewerage commission in relation to the purification *546 of the Passaic river and the streams tributary thereto, and particularly the provisions of chapter 14 of this title (§ 58:14-1 et seq.)." N.J.S.A. 58:12-40.
Under N.J.S.A. 58:14-7 the Commission, as already observed, is entrusted with enforcng a prohibition against pollution of the Passaic River and its tributaries between Paterson and the mouth of said river at Newark Bay. However, the pollution, of which the Department herein complains, is caused by the Commission's discharge of inadequately treated sewage into the waters of Upper New York Bay, not among those waters over which the Commission has the "power and authority" to prohibit pollution.
The commissioners and the District's contracting municipalities are vested under N.J.S.A. 58:14-16 with "absolute discretion in the determination of the size and capacity of each such intercepting sewer, plant and works * * *", and it is argued that under this provision they have "absolute discretion" over those matters dealt with in the orders disputed herein to the exclusion of the Department. However, the Department's orders for the post-chlorination and B.O.D. reduction of defendant's effluent do not affect intercepting sewers; nor do they affect determinations of the "size and capacity" of defendant's plant insofar as such plant is of "reasonably sufficient" construction to be able to "dispose of sewage and other polluting matter of the contracting municipalities." N.J.S.A. 58:14-16. The orders deal, instead, with the intensity of effluent treatment afforded by defendant's facility, which at this time discharges inadequately treated wastes into waters outside defendant's jurisdiction. The "absolute discretion" granted the Commission and the contracting municipalities does not extend to such matters. Moreover, although the Legislature delegated supervision to the Department over plant "unit design" for the proper care and treatment of sewage, N.J.S.A. 58:12-2, it did not delegate to the Commission and the contracting municipalities "absolute discretion" over the determinations of treatment plant "unit design."
*547 The Commission argues that N.J.S.A. 58:11-10 exempts it from having to submit reports and plans to the Department, as demanded in the amended order of March 31, 1967. Such an exemption would seriously impair the Department's administration of its orders. N.J.S.A. 58:11-10 provides that:
"No work upon the construction of changes, improvements, extensions or alterations to any water purification or treatment plant, sewer system or plant for the purification or treatment of sewage or industrial wastes shall be begun until detailed plans and specifications therefor have been submitted to and approved by the state department of health, but the provisions of this section shall not be deemed to apply to changes, improvements, extensions or alterations to any sewer system or plant for the purification or treatment of sewage or industrial wastes located within the territory over which the Passaic valley sewerage commissioners have jurisdiction."
The apparent purpose of N.J.S.A. 58:11-10 is to enable the Department to exercise routine pre-construction supervision over all sewage and industrial waste treatment projects in the State, except over those to be situated in the territorial jurisdiction of the Commission. This statute, however, does not deprive the Department of the authority, pursuant to N.J.S.A. 58:12-2 and 3, to investigate the Commission's method of sewage disposal in waters within its jurisdiction and beyond the Commission's "power and authority," and to prevent pollution therein by issuing a corrective order to the Commission. If the Department could not require the Commissioners to submit reports, plans and specifications of the improvements ordered, it could not effectively administer its directive. Hence, the exclusion of the Commission's projects in N.J.S.A. 58:11-10 from the blanket pre-construction obligation to submit detailed plans and specifications cannot serve to cripple the Department's administration of properly issued pollution control orders.
I am of the opinion that no legislation is extant which has whittled away the power of the State or its agency, the Department, so as to deprive the Department of jurisdiction *548 over pollution prevention in the New Jersey waters of Upper New York Bay, or to bar the Department in the instant situation from prescribing certain unit design improvements in the Commission's treatment of sewage or from requiring that plans and specifications to effectuate said improvements be submitted to the Department for its approval.
Defendant further contends that the Department is barred from asserting jurisdiction over its polluting discharges into Upper New York Bay by a stipulation entered into between the Commission and the Federal Government in the proceedings of People of State of New York v. State of New Jersey, 256 U.S. 296, 41 S.Ct. 492, 65 L.Ed. 937 (1920). The United States Government had been permitted to intervene after New York State had sued to enjoin the construction of defendant's sewage treatment and disposal facilities. The State of New York had alleged that the pollution prevention measures required for the project by New Jersey were inadequate to protect the public health and welfare.
By a stipulation authorized and approved by the State of New Jersey, L. 1910, c 158, the Commission and the Federal Government agreed, in return for the Federal Government's dismissal from the litigation without prejudice, that the Commission would execute specified improvements in the treatment plant at Newark Bay and sewage dispersal equipment near Robbins Reef Light. The stated purposes of these adjustments were to eliminate from defendant's effluent "visible suspended particles," deposits harmful to navigation, odors, grease or discoloration, health hazards, to avoid property damage and to achieve the "absence of reduction in the dissolved oxygen contents of the waters of New York Bay, resulting from the discharge of Passaic Valley sewage, to such an extent as to interfere with major fish life."
Further, defendant and the Federal Government stipulated that these objectives would be secured either through compliance with the requirements of the specified improvements *549 agreed to "or through requisite lawful additional arrangements * * *."
Perhaps as recently as 1935 the aforesaid stipulation was still considered the arrangement controlling the Commission's obligation to prevent pollution in New York harbor. The New Jersey legislation authorizing an interstate compact for the formation of the Interstate Sanitation Commission, L. 1935, c. 321, exempted the defendant from the supervision of that body contingent upon the continued enforcement of this stipulation. N.J.S.A. 32:18-13. But, significantly, the same legislation states that:
"Nothing in this compact shall be construed to * * * prevent the enactment of any legislation or the enforcement of any requirement by any signatory state imposing any additional conditions and restrictions to further lessen or prevent the pollution of waters within its jurisdiction." N.J.S.A. 32:18-10.
Although the State of New Jersey, in empowering the Commission to enter into the stipulation, approved of and consented to it, People of State of New York v. State of New Jersey, supra, at p. 307, 41 S.Ct. 492, nothing in the stipulation is directed toward prohibiting the State from enforcing more stringent pollution controls over waters within its jurisdiction, and no such prohibition should be implied.
In passing, it is noted that the specific engineering requirements of the stipulation have probably been rendered outmoded by progress in sanitary science and that recent federal statutes re-aligning the water pollution control responsibilities of all levels of government have, in effect, supplanted the additional "requisite lawful arrangements" contemplated in the stipulation. Even in 1920 the United States Supreme Court observed that due "to the rapid advances in sanitary science then in progress," People of State of New York v. State of New Jersey, supra, at p. 308, 41 S.Ct., at p. 496, new practicable methods of reducing the polluting effect of sewage disposal were evolving. This scientific advance has accelerated. See Cloyes v. Delaware Township, 41 N.J. *550 Super. 27, 42 (App. Div. 1956) (concurring opinion by Conford, J.), affirmed 23 N.J. 324 (1957). Moreover, in 1953 when the State Legislature enacted L. 1953, c. 388, (N.J.S.A. 58:14-34.10), it declared that defendant Commission must improve its sewage treatment and disposal facilities "in order to provide for the increase of population and the rise in acceptable standards for sewage treatment and disposal."
Teamed with this scientific progress, the Federal Water Pollution Control Act of 1948, 62 Stat. 1160, and its amendments have wrought such radical changes in national water pollution control policy that the direct working arrangement between defendant and the United States, embodied in the 58-year-old stipulation, now appears anachronistic.
The declared policy of the Federal Water Pollution Control Act is that Congress shall
"* * * recognize, preserve and protect the primary responsibilities and rights of the States in preventing and controlling water pollution * * *." 33 U.S.C.A. § 466(b)
The Congress has also declared that
"Nothing [in this Act] shall be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." 33 U.S.C.A. § 466(c)
Moreover, the act provides that efforts by a state to abate pollution endangering the public health and welfare shall not be displaced by federal enforcement until the full course of lengthy preliminary procedures (see 33 U.S.C.A. § 466 g(d)(1), (d)(4), (e), (f) and (g)(1)) result in a federal court order, 33 U.S.C.A. 466g(h). This protracted abatement process affords the states or their appropriate water pollution control agency, 33 U.S.C.A. § 466g(e), time and encouragement toward the exercise of their primary responsibility of water pollution control.
*551 In the Water Quality Act of 1965, 79 Stat. 903 (which added, inter alia, section 10(c) to the Federal Water Pollution Control Act) the policy of delegating first-line responsibility to the states was extended. The legislation requires that the state water pollution control agency, e.g., the Department, adopt water quality criteria for application to "interstate waters or portions thereof," such as Upper New York Bay, and prepare an implementation and enforcement plan, said criteria and plan being subject to review and approval of the Federal Water Pollution Control Administration, U.S. Department of the Interior. 33 U.S.C.A. § 466g(c) (1). Upon a state's establishment of enforceable water quality standards approved by the Secretary of the U.S. Department of the Interior, water pollution control projects in that state, such as that prescribed herein by plaintiff, become eligible for an increased percentage of federal aid. 33 U.S.C.A. § 466e(b). The Water Quality Act also gives the Federal Government the power to abate discharges into these waters which reduce the quality of such waters below the water quality standards established by the state. 33 U.S.C.A. § 466g(c) (5).
Before the enactment of the Water Quality Act which made the adoption of water quality criteria for interstate waters obligatory upon the states, plaintiff Department had already established general classifications of quality standards for the fresh and tidal waters of the State. These standards, however, had not yet been assigned to each of said bodies of water or portions thereof and plans for their implementation had not yet been drawn. New Jersey Department of Health, "Regulations Establishing Certain Classifications to be Assigned to the Waters of This State and Standards of Quality to be Maintained in Waters so Classified," effective September 1, 1964. Pursuant to N.J.S.A. 58:12-3 and section 10(c)(1) of the Federal Water Pollution Control Act, the Department next promulgated a TW-2 classification for the surface waters of the Hudson River, encompassing the disposal area of the Passaic Valley Sewerage *552 Commission's outfall in Upper New York Bay. New Jersey Department of Health, "Classification of the Surface Waters of the Hudson River, Arthur Kill and Tributaries," effective May 16, 1966. Prior to the adoption of this classification a representative of defendant appeared at a February 1966 public hearing held by the Department on its proposed classification of tidal waters. He objected to the stringency of a TW-2 water quality standard for the waters of Upper New York Bay and suggested instead a TW-3 standard. A TW-2 water quality standard is more rigorous than a TW-3 classification in that it requires for dissolved oxygen a higher minimum percentage of saturation. Defendant also objected at this public hearing to the Department's orders for seasonal post-chlorination effluent disinfection until all disposers of wastes into the harbor, including those in New York State, are similarly compelled to treat their effluent.
The orders disputed herein were drawn by plaintiff Department to assure that the treatment and disposal of the Commission's effluent meets the applicable water quality standards for Upper New York Bay  those contained in classification TW-2. The directive to the Commission to achieve an 80% reduction in the biochemical oxygen demanding substances of its effluent follows the conclusion and recommendation of the Hudson River Conference, Second Session, called by the Secretary of the Interior under 33 U.S.C.A. § 466g(d) (1) in September 1967.
The TW-2 water quality criteria for Upper New York Bay and its implementation plan were reviewed and approved by the Secretary of the Interior on March 13, 1968. In fact, the Secretary noted that although he was "presently approving the dissolved oxygen criteria for TW-2 * * * waters, it [was his] hope that installation of treatment measures will improve water quality to the extent that these limits can be raised." Pertinent to the Department's order for post-chlorination treatment is the Secretary's suggestion that "[b]acteriological criteria appear necessary in TW-2" waters. See the letter from Stewart L. Udall, Secretary *553 of the U.S. Department of the Interior to New Jersey Governor Richard J. Hughes, March 13, 1968, copy of which was recently furnished to the court with the consent of counsel.
My conclusion that the Department has jurisdiction to issue the directives in question to the Commission, in effect enables the Department to discharge the responsibilities of pollution control over interstate waters assigned to it under section 10(c) of the Federal Water Pollution Control Act. However, it is unnecessary to decide, and the issue is not raised in the complaint, as to whether the Department may exercise jurisdiction regarding pollution in the intrastate waters of the Passaic River between Great Falls in Paterson and its mouth at Newark Bay.
The Commission also challenges the reasonableness of plaintiff's orders. I have already alluded to the fact that the Department by regulation assigned to the waters of Upper New York Bay a TW-2 water quality classification, after a public hearing at which the Commission registered objection to its stringency. The federal authority recently approved this classification. Apparently the Commission never appealed the classification. Nevertheless, Seymour Lubetkin, Chief Engineer for the Commission, in his affidavit asserts that the Department's order requiring 80% B.O.D. removal "is arbitrary and at this time not necessary for the preservation of acceptable water in New York Harbor." The reply affidavit of Ernest R. Segesser, the Department's Chief Engineer of the Water Pollution Control Program, explains that the Department retained a consulting engineering firm to determine the requisite degree of treatment of all sewage discharged into the Hudson River complex in order to restore this area to the level of quality established for TW-2 waters, e.g., in regard to dissolved oxygen, a minimum percentage of not less than 50% of saturation. This firm's analysis indicated that an 80% biochemical oxygen demand removal would be necessary to achieve this goal. The federal *554 authority has concurred in this degree of treatment. See letter of March 13, 1968, supra.
As to seasonal post-chlorination, the Lubetkin affidavit states that since the Commission contemplates certain improvements in its treatment plant, independent of the Department's order, an evaluation of the effluent's need for chlorination should be postponed until these improvements are effected. Segesser, in his affidavit, states that there is no justification in delaying the installation of post-chlorination equipment, because the effluent's chlorination demand will not be reduced significantly by the Commission's proposed improvements. He also notes that the aforementioned Hudson River Conference concluded that all the waters within its jurisdiction should receive effective disinfection as required to protect desired water uses. Segesser further indicates that, except for defendant's plant, seasonal post-chlorination equipment has been installed, or plans for such installation are under way, in all of the New Jersey primary sewage treatment plants discharging into the Hudson River complex.
Even though Lubetkin's affidavit raises issues on the merits of the Department's orders, it must be noted that the Commission failed to bring any action in the Superior Court to review the findings or orders of the Department within the three-month period prescribed in N.J.S.A. 58:12-2, State Dept. of Health v. North Wildwood, 95 N.J. Eq. 442 (Ch. 1924). Cf. Bergsma v. Town of Kearny, 24 N.J. Super. 43 (App. Div. 1952). In any event, the record supports a finding that plaintiff's orders are based upon reasoned judgment and should be enforced.
The conventional financing procedure for Passaic Valley Sewerage Commission projects and its constrictions were earlier noted. The Commission urges that financing of the improvements ordered by the Department would cost millions of dollars and severely strain the resources of the contracting municipalities. See N.J.S.A. 58:14-34.10. The fact that these sewage treatment improvements are costly *555 and difficult to finance does not relieve the Commission from its responsibility to cease polluting the waters of Upper New York Bay. State Dept. of Health v. North Wildwood, supra; Interstate Sanitation Comm. v. Weehawken Twp., 141 N.J. Eq. 536, 549 (Ch. 1948), modified 1 N.J. 330 (1949). Perhaps federal and state financial aid can be obtained for this project.
As already noted, plaintiff's order of April 27, 1965 required effective post-chlorination of the effluent from defendant's plant to be accomplished on or before May 15, 1967. This order was reaffirmed in the amended order of March 31, 1967. Obviously, the permanent facilities to perform this work cannot now be installed within the time prescribed. Defendant is directed to accomplish the same within such time as the Department may deem appropriate.
Defendant is also directed to comply with that part of plaintiff's amended order of March 31, 1967 which requires that the Commission cease the discharge of improperly and insufficiently treated sewage into the waters of the Upper New York Bay. It is for the Department to determine whether the exigencies of the situation reasonably demand adherence to the order's October 30, 1970 deadline or permit a delay. The report upon the proposed basis of design of additions and alterations which was to have been submitted by the Commission for review and approval by the Department on or before October 1, 1967 will be submitted to the Department for such review and approval on a date the Department now deems feasible.

ADDENDUM TO OPINION FILED
After filing the opinion in this matter the following provision has been brought to the court's attention:
"* * * The jurisdiction of the Surgeon General, or any other agency which has jurisdiction pursuant to the provisions of this Act, shall not extend to any region or areas nor shall it affect the rights or jurisdiction of any public body where there are in effect *556 provisions for sewage disposal pursuant to agreement between the United States of America and any such public body by stipulation entered in the Supreme Court of the United States. While any such stipulation or modification thereof is in force and effect, no proceedings of any kind may be maintained by virtue of this Act against such public body or any public agency, corporation or individual within its jurisdiction. Neither this provision nor any provision of this Act shall be construed to give to the Surgeon General or any other person or agency the right to intervene in the said proceedings wherein such stipulation was entered." Water Pollution Control Act, ch. 758, § 2 (d)(7), 62 Stat. 1159 (1948), as amended 33 U.S.C.A. 466-466j (1966).
In effect, the above provision in the 1948 Water Pollution Control Act excluded the Passaic Valley Sewerage Commission from the jurisdiction of the federal enforcing agencies and restricted the federal government's efforts to secure improvement of the Commission's pollution control facilities to negotiation with the Commission of "requisite lawful additional arrangements" pursuant to the 1910 stipulation. In the course of overhauling and strengthening the federal water pollution control scheme in 1956, Congress repealed this jurisdictional limitation pertaining to the stipulation. Significantly, the 1956 amendments also provided that the Act should not be construed as impairing in any manner the jurisdiction of states over their waters (Upper New York Bay included) and that state and interstate action to abate pollution in interstate waters shall be encouraged and shall not be displaced by federal enforcement except when federal enforcement eventuates in a court order. Federal Water Pollution Control Amendments, ch. 518, §§ 1 (b), 8 (b), 70 Stat. 498, 504 (1956), as amended 33 U.S.C.A. 466-466h (1966). As noted in my opinion, the Water Quality Act of 1965 underscored the first-line enforcement responsibility of the states in regard to all interstate waters by requiring the states to promulgate water quality criteria and to implement and enforce them. 33 U.S.C.A. § 466g(c).
Hence, the history of the federal legislation confirms the court's observation in the opinion that these statutes have in effect supplanted the "requisite lawful additional arrangements" *557 contemplated in the 1910 stipulation and bolsters the conclusion therein stated that the Department has authority to impose water pollution controls respecting discharges from the Commission's plant into Upper New York Bay beyond those provided for in the stipulation.