Freeman Coal Mining Corporation, Petitioner, *v.* The Pollution Control Board *et al.*, Respondents.

(No. 73-188;

Fifth District—June 28, 1974.

158

Richard R. Elledge, of Schradzke, Gould and Ratner, of Chicago, for petitioner.

William J. Scott, Attorney General, of Springfield (Larry R. Eaton, Assistant Attorney General, of counsel), for respondents.

Mr. JUSTICE CARTER delivered the opinion of the court:

Freeman Coal Mining Company, a division of Material Service Corporation (successor in interest to Freeman Coal Mining Corporation, the original party), owns the Freeman Crown Mine, which was in operation from 1953 to 1971. During that 18-year period, a mine refuse or gob pile was formed in the processing of the mined coal. The pile eventually reached a height of 70 feet and covered approximately 70 acres. Rainfall upon the pile reacts with the materials in it to form acidic contaminated run-off, which drains into an unnamed tributary of the Macoupin Creek. In order to treat these discharges, Freeman constructed a collection and treatment system in 1966 using a lime-treatment pond and settling pond at a capital expenditure of approximately $90,000 and a maintenance expense of approximately $25,000 per year.

Despite the system, contaminating discharges entered the unnamed tributary causing water pollution on May 20, July 8, July 23, and July 29, 1971. The parties stipulated to these findings. A complaint was filed by the Environmental Protection Agency (EPA) on December 3, 1971 (the mining operations had ceased on September 30, 1971), charging violations of section 12(d) of the Environmental Protection Act (Ill. Rev. Stat., ch. 111½, § 1012(d)), depositing contaminants on land so as to cause a water pollution hazard; sections 12(a), (b) and (c), allowing pollutional discharges; and certain provisions of SWB-14, Sanitary Water Board regulations (selectively incorporated in the Act by section 49(c)). A hearing was held on September 22, 1972, at which time the parties entered into a stipulation of facts. During this period Freeman effected considerable repairs and improvements to the system, but no finding was made at the time of the hearing as to the quality and content of the discharges from the pile.

The Board entered its order on March 22, 1973, modified in part on May 17, 1973. The order found violations by Freeman of sections 12(a) and (d) of the Act, and Rules 203(a) and (b) of chapter 3, Water Pollution Regulations formerly incorporated in SWB-14. Freeman was ordered to cease and desist from such violations and to maintain its water-treatment system to meet effluent criteria of Pollution Control Board's Rule 606 of chapter 4 and its Water Quality Standards of chapter 3. To assure conformity to these standards, Freeman was required to

obtain a permit for the system and file monthly reports. A $25,000 performance bond was imposed as well as a $5,000 penalty for past violations. Freeman appealed the order, except to the extent it required a permit and filing of reports.

The issues on appeal are:

1. Whether the Illinois Environmental Protection Act imposes liability on a landowner for the discharge of contaminated rain water.
    a. Whether such liability can be based on passive ownership of land.
    b. Whether such liability can be based on acts occurring before they were proscribed.
2. Whether the standards and regulations of the Illinois Pollution Control Board (PCB) have been properly applied to petitioner; to what extent do they impose future obligations.
3. Whether the PCB has the authority to require that a performance bond be posted in this case.
4. Whether the evidence indicates a violation by petitioner for which the PCB may impose a monetary penalty.

Section 12(a) of the Act provides:

"No person shall:

Cause or threaten or allow the discharge of any contaminants into the environment in any State so as to cause or tend to cause water pollution in Illinois, either alone or in combination with matter from other sources, or so as to violate regulations or standards adopted by the Pollution Control Board under this Act;   *   *   *."
Ill. Rev. Stat., ch. 111½, § 1012(a).

Petitioner's argument is essentially that it cannot be held liable for "allowing" the discharges because such discharges are the result of rain water, a natural force beyond the control of petitioner, interacting with the gob pile, the bulk of which was created prior to July 1, 1970, the effective date of the Act. It is argued that, if petitioner is held liable, a new estate in land will have been created, since mere passive ownership of land has not previously in Illinois given rise to the imposition of personal obligations.

The controversy appears to center around the meaning of the word "allow." Petitioner cites section 31(c) of the Act (Ill. Rev. Stat., ch. 111½, §1031(c)) to support its contention that the Board must prove more than passive ownership:

" 'In hearings before the Board under this Title the burden shall be on the Agency or other complainant to show either that the respondent has *caused of threatened to cause* air or water pollution   *   *   *.' " (Emphasis added by petitioner.)

■■ Thus it is argued that the absence of the word "allow" from the provision of the Act, which sets the standard of proof, is evidence that proof of "allowing" pollution is not sufficient to sustain a violation. However, section 31(c) continues:

"* * * or that the respondent has *violated or threatened to violate any provision of this Act* or any rule or regulation of the Board * * *." (Emphasis added.)

The reference to other provisions of the Act clearly includes the prohibition in section 12(a) against *allowing* water pollution.

Even if the Act does not make allowing pollution a violation, petitioner contends this is an unconstitutional exercise of legislative power, citing *Leet v. Montgomery County,* 264 Md. 606, 287 A.2d 491 (1972). *Leet* is cited as the only case in which "a governmental body did expressly attempt to inject such an affirmative obligation," *i.e.,* the imposition of personal liability for ownership of land, which the Supreme Court of Maryland found unconstitutional.

*Leet* involved a county zoning ordinance which permitted certain uses for land zoned Rural-Residential. Defendant was ordered to remove at his own expense abandoned automobiles which had accumulated on his property (other than residence) without his consent or knowledge, as constituting a violation of the ordinance. On review of the lower court order, the supreme court observed that the ordinance referred to volitional acts as comprising particular uses, *i.e.,* the "establishment, operation or maintenance" of rubbish or junk in the R-R zone was a prohibited use. Some involvement of the landowner appears to be required, at least to the extent of knowledge or ratification. Without any such involvement:

"It would appear that the *use* that was thus being made of the property was by trespassers and not by the property owner or one privy with him." 264 Md. 606, 610, 287 A.2d 491, 494.

In the instant case there is no question that petitioner had knowledge of the pollutional discharges flowing from its land and the gob pile it had created. However, there are other grounds for distinguishing *Leet* beyond lack of knowledge and consent. In *Leet* one of the arguments advanced by defendant was that the order constituted a conficatory taking of his property without compensation or due process. In rejecting this contention the court distinguished between those actions of landowners which endanger the health or safety of their neighbors and those which are more properly classified as eyesores or blighted areas in the community:

We have no question but that the County would have properly been entitled to injunctive relief had the property owner used the property for the accumulation of rubbish or had suffered, permitted or consented to the accumulating and dumping of rubbish

on his property. It must not be supposed that had the accumulation of rubbish in this case, although dumped upon the property by trespassers, constituted an immediate threat to the health or safety of the surrounding residents, the County would not have been entitled to a mandatory injunction requiring the property owner to abate the nuisance at his own expense. [Citation.] * * *

However, the record fails to reveal any immediate threat to health or public safety; * * * the offensive aspect of the accumulation of abandoned vehicles lay solely in its affront to the aesthetic sense." 264 Md. 606, 611-612, 287 A.2d 491, 495.

Clearly, pollution of the waters here is a threat to the health and welfare of the surrounding residents. There was some evidence at the hearing that the seepage had rendered nearby crop land nearly unproductive and, while the pollution in one sense did cause aesthetic damage, i.e., turn the water orange and turbid, it also seriously affected the fish and insect population of the stream and adjacent vegetation.

Respondent justifies the Act's prohibition against allowing pollution as a legitimate exercise of the police power to regulate the use of land for protection of the public health, welfare and safety, citing *Airtex Products, Inc. v. Pollution Control Board,* 15 Ill.App.3d 238. In *Airtex* the petitioner was charged with violating SWB-5 and section 12(a) for discharging cyanide into the municipal sewer system, which had the effect of destroying organisms in the treatment plant that broke down wastes. Petitioner argued that it had an absolute right to use the sewer system, notwithstanding its failure to obtain a permit, by virtue of payment of a special assessment. The Fifth District Appellate Court disagreed:

"Even after a special assessment, the rule to be applied is that the right to connect to a sewer system of a municipality is subject to reasonable regulations imposed by the State and city." (15 Ill.App.3d 238, 243.)

Petitioner was ordered to obtain a permit for the discharges and submit a plan for abatement.

Controlling on this issue is the case of *Meadowlark Farms, Inc. v. Pollution Control Board,* 17 Ill.App.3d 851, decided on February 22, 1974, by this court. In *Meadowlark* the petitioner was charged with violations of section 12(a) and SWB-14 for discharges into Brushy Creek and its tributary caused by runoff from a mine refuse pile located on its property. Petitioner argued that it had not created the pile, nor did it know of the pollutional discharges, thus it could not be required to control or prevent them. The court noted that petitioner admitted that seepage from the pile created a flow in the tributary (which normally flowed only when it rained), that fish died as a result of the seepage and that a division

of petitioner's parent company had initiated an abatement. The court found that:

> "This unquestioned pollution proves sufficiently that the petitioner allowed the discharge within the meaning of section 12(a)." 17 Ill.App.3d 851, 861.

■■  Petitioner's admission of pollution in this case falls within the *Meadowlark* test. Paragraph 12 of the stipulation entered into on November 13, 1973, by the parties states:

> "Freeman acknowledges that despite said system, malfunctioning and/or accidental discharges occurred which resulted in discharges of contaminants to the water of Illinois which caused water pollution on or about the following dates: [dates omitted]."

That the discharges were accidental and not intentional, or that they occurred in spite of petitioner's efforts to prevent them, is not a defense, as is urged by petitioner. As the court stated in *Meadowlark*, "The Environmental Control Act is *malum prohibitum*, no proof of guilty knowledge or *mens rea* is necessary to a finding of guilt." (17 Ill.App.3d 851, 861.) The facts of petitioner's construction of a treatment facility and subsequent improvements thereto go to mitigation, not to the primary issue of liability.

We find support for our view in other jurisdictions. For example, in *Akin & Dimock Oil Co. v. State*, 95 Okla. Crim. 218, 243 P.2d 384 (1952), an employee of defendant allowed a quantity of oil to escape, and a heavy rainfall washed the oil into a nearby creek. Defendant was charged with violating a criminal statute which prohibited the discharge or permitting discharge of crude oil in the water of the State. The court, in rejecting defendant's argument that the discharge was caused by an act of God beyond its control, held defendant liable because the legislation imposed a duty to take all prudent measures to prevent the pollution.

We note also several cases striking the defense that treatment to prevent polluting discharges is so costly as to impose a financial burden. *Department of Health v. Passaic Valley Sewerage Com.*, 100 N.J. Super. 540, 242 A.2d 675 (1968), *aff'd*, 105 N.J. Super 565, 253 A.2d 577 (1969); *Sanitary Water Board v. Wilkes-Barre*, 109 Pa. Super. 492, 185 A.2d 624 (1962); *United States v. Vulcan Materials Co.*, 320 F.Supp. 1378 (D.N.J. 1970).

Section 12(d) of the Act provides:

> "No person shall:
>
> *      *      *
>
> (d) Deposit any contaminants upon the land in such place and manner so as to create a water pollution hazard."

Petitioner argues that application of section 12(d) in this case is retroactive and unconstitutional; that the gob pile was created over a period

of 18 years, only 15 months of which was after the effective date of the Act, July 1, 1970; and that, since the refuse added to the pile over those 15 months had only a de minimis effect on the polluting discharges, petitioner is in effect being held liable for the creation and impact of the entire gob pile.

Petitioner cites three cases in support of this argument, which state the traditional rule regarding retroactive legislation. *Society for the Propagation of the Gospel v. Wheeler*, 2 Gall. 105 (C.C.N.H. 1814), is included for the classic formulation by Justice Story, that a law is retrospective if it creates a new obligation, imposes a new duty or attaches a new disability in respect to past transactions.

In *Theodosis v. Keeshin Motor Express Co.*, 341 Ill.App. 8 (1950), the court denied retroactive application to a statute which increased the maximum amount recoverable in an action for wrongful death from $5,000 to $10,000. But in its opinion the court distinguished one type of legislation which *may* be given retroactive effect without violating due process:

> "When courts are examining legislation relating to matters of general public interest, such as election laws, roads, and tax validations, they apply the laws retroactively, even though it may affect a substantive right. On the other hand, in their relationship with each other as individuals, men should be able to assess with some assurance the results of their conduct." 341 Ill.App. 8, 24.

Arguably at least the Act falls within the first category as relating to matters of general public interest.

Petitioner also cites *Barrett v. Guaranty Bank & Trust Co.*, 123 Ill.App. 2d 326 (1970), in which a construction loan was made in 1960 at a usurious rate to be paid over a 6-year period. In 1963 the usury law was amended to permit recovery of punitive damages as well as the amount of interest paid. Plaintiff sought imposition of a penalty for the period of 1963-1966, arguing that it constituted a separate violation. The court declined to give the amendment retroactive application on grounds that usuary occurs at the time the loan is negotiated, not as the interest is paid. In contrast, pollution occurs at the time of discharge, not at the time the pollution source is created.

■■ We agree with respondent that the Act is not applied retroactively in this case; first, petitioner admitted in paragraph 12 of the stipulation to water pollution on four dates in 1971, all of which were after the effective date of the Act; second, petitioner stipulated in paragraphs 3, 4, and 5 to the generation of mine refuse from the coal-preparation plant and its addition to the gob pile for 15 months after July 1, 1970, which is a clear violation of section 12(d) itself.

In *People v. Jones*, 329 Ill.App. 503 (1946), the court held that the

mere maintenance of a situation legal before the passage of prohibitive legislation could give rise to liability after it. Liability in *Jones* was predicated on section 221 of the Criminal Code of 1874 (Ill. Rev. Stat. 1945, ch. 38, par. 466(10)), which stated:

"It is a public nuisance:

\*    \*    \*

10. To permit any well drilled for oil \* \* \* to remain unplugged, after such well is no longer used for the purpose for which it was drilled."

Defendant argued unsuccessfully that this provision was inapplicable to him since the well he had failed to plug was drilled and abandoned 18 months before the effective date of the statute. Cited in *Jones*, 329 Ill.App. 503, 524, is the classic case of *Chicago & A. R.R. Co. v. Tranbarger*, 238 U.S. 67, 59 L.Ed. 1204, 35 S.Ct. 678 (1914), which involved the passage of legislation compelling railroads to construct transverse openings in roadways to facilitate drainage. Defendant contended it was not thereby under a duty to install such openings in the embankment which had been laid prior to the statute. The court did not agree:

"The argument that, in respect to its penalty feature the statute is invalid as an *ex post facto* law is sufficiently answered by pointing out that the plaintiff in error is subjected to a penalty not because of the manner in which it originally constructed its railroad embankment, nor for anything else done or omitted before the passage of the act of 1907, but because after that time it maintained the embankment in a manner prohibited by that act." 238 U.S. at 73, 59 L.Ed. at 1209.

Again, we feel that the opinion in *Meadowlark Farms, Inc. v. Pollution Control Board,* 17 Ill.App.3d 851, is in point, where the court says:

"Petitioner's argument that the Environmental Protection Act as applied to it is retroactive and an *ex post facto* law is simply not supported by the evidence. The complaint charged the petitioner with allowing pollutional discharges from its property on or subsequent to July 1, 1970, and continuing through the close of the record in this case. The Environmental Protection Act went into effect on July 1, 1970. Therefore the violations which petitioner was found guilty of allowing to occur, took place after the Act was in force. Thus the Act is not retroactive as applied to the petitioner." 17 Ill.App.3d at 862.

Petitioner argues that chapter 4, Mine Related Pollution Regulations, has been too broadly construed in this case by the Board, rendering its application here unconstitutional under Ill. Const. (1970), art. 1, secs. 2, 16, and U.S. Const. amend. XIV. The guarantee of due process is modified by the reasonable exercise of the police power by the legislature to

regulate or prohibit anything harmful to the welfare of the people. (*People v. Wilson*, 4 Ill.App.3d 766.) Article 1, section 16, prohibits *ex post facto* laws, as well as those impairing the obligation of contract. That contract rights are subject to reasonable and legitimate exercise of the police power by the State is well settled. *Meegan v. Village of Tinley Park*, 52 Ill.2d 354.

The cases cited by petitioner are inapposite, as they appear only to restate the traditional rules on retroactive application of legislation. *Orlicki v. McCarthy*, 4 Ill.2d 342 (1954), held that the limitation provision of the Dram Shop Act could be given retroactive effect because of its procedural character. In *Champaign County Bank & Trust Co. v. Jutkins*, 29 Ill.2d 253, 256 (1963), the question was whether an amendment making wills revocable by divorce in the absence of a contrary intent should be made applicable to a will executed before its enactment, where the divorce and probate occurred after it. The court denied retroactive effect to the provision.

The crux of petitioner's argument is the applicability of the chapter 4 regulations, adopted in May, 1972, to this gob pile. Petitioner cites Rule 401 as evidence that chapter 4 should not be so applied:

> "The operator shall dispose of mine refuse generated after the effective date of these Regulations in accordance with a plan
>  \* \* \* ."

However, Rule 401 continues:

> "\* \* \* submitted as part of a permit application hereunder and approved by the Agency."

Petitioner, in filing notice of appeal, did not seek review of paragraph 3 of the Board's order, which required it to obtain a permit for the water-treatment system; thus, any questions involving Rule 401 are rendered moot on this appeal.

■■ Respondent argues that to the extent the Board applied chapter 4 to Freeman it was proper and reasonable. The Board distinguished two types of mine refuse, gob and sludge, which is included in the definition of mine refuse in chapter 4, Rule 103(i). Rule 201 makes it unlawful for an operator (Rule 103(n): anyone who engages in mining or generation or disposal of mine refuse) to dispose of mine refuse 6 months after the date of the Regulations without a permit from the Agency. Since Freeman is engaged in the disposal of refuse, *i.e.*, sludge, as a by-product of the treatment system, Rule 201, as well as Rule 401, are applicable. There is no real controversy, however, because of petitioner's failure to appeal paragraph 3 of the order.

Petitioner contends that language in the Board's opinion indicating that it might be required in the future "to take further pollution abatement action," possibly to include covering the mine-refuse pile, wrongfully

invokes standards in Rule 401(c)(2), (e) and injects uncertainty into petitioner's future.

This statement by the Board makes no reference to the refuse pile. Furthermore, the Board stated clearly that:

> "The 70 acre mine refuse pile was created in its entirety before the effective date of the Mine Related Pollution Regulations, and therefore is not covered by those Regulations."

The language which follows contains the implication that, if Freeman's system is not successful in reducing pollution even after improvements and repairs, further action may be necessary. Freeman will have the opportunity to litigate these issues if and when they arise in a concrete controversy. In *Gromer Supermarket, Inc. v. Pollution Control Board,* 6 Ill.App.3d 1036, plaintiffs were denied an injunction to restrain the Board from holding hearings on proposed beverage-container regulations on grounds that such regulations, if adopted, would be unconstitutional. That case appears to be controlling on this issue:

> "The complaint alleges that the Board announced that it had authority to adopt a regulation as proposed by the [Solid Waste Management] Task Force, but, no such regulation has been adopted. The situation simply is that the Board has scheduled hearings in an effort to determine whether or not this proposed regulation should be adopted. No person can predict the future course of action which the Board will take and whether or not it will, in fact, adopt the [recommended] regulation in any form. Under circumstances of this kind, [we] hold that the controversy between these parties is not presently ripe for adjudication." 6 Ill.App.3d 1036, 1041.

■■ Petitioner argues that chapter 3 and 4 standards should not be applied "retroactively" to its treatment system. Rule 203 of chapter 3 prescribes general water-quality standards which apply, except as otherwise provided, to "all waters of the State." Clearly the unnamed tributary falls within this definition. Rule 606 of chapter 4 sets somewhat less stringent effluent criteria for contaminants released into water from mine-related operations. Subsection (b) of the rule requires compliance for new sources on the effective date of the regulations and for existing sources within 6 months thereafter. As Freeman's system is an existing source, compliance was required as of 6 months after May, 1972, meaning that chapter 4 standards were applicable as of March, 1973, the date of the order, and at the present time.

The opinion of the Board established a mixing zone extending the length of the unnamed tributary to permit dilution of effluent from Freeman's system in order to comply with stricter chapter 3 Water Quality Standards. Petitioner contends this is an arbitrary and unreasonable exer-

cise of discretion by the Board since the stream is intermittent and occasionally dry and would sometimes provide no dilution at all.

Rule 201(a) of chapter 3 specifically leaves the determination of the size of the mixing zone to the discretion of the Board, subject to certain governing principles. Six criteria are set forth, which must be taken into consideration:

1. The character of the body of water.
2. The present and anticipated future use of the body of water.
3. The present and anticipated water quality of the body of water.
4. The effect of the discharge on the present anticipated future water quality.
5. The dilution ratio.
6. That nature of the contaminant.

Petitioner does not attempt to show that these factors were not taken into account. Indeed, the Board's opinion observed that the size of the proposed mixing zone was intended to avoid pollution of the Macoupin Creek, a relatively healthy body of water. It is true that paragraph 34 of the stipulation implied that at least part of the creek would be used as a mixing zone, but this alone is not sufficient to overturn a finding of the Board.

■■■ The familiar rule of review of agency decisions under the Administrative Review Act (Ill. Rev. Stat., ch. 110, § 264 *et seq.*) is that findings of fact by the agency are prima facie correct, reviewable only to determine if they are supported by the evidence, and reversible only if they are contrary to the manifest weight of the evidence. (*Bruce v. Department of Registration & Education,* 26 Ill.2d 612; *Lo Poccolo v. Department of Registration & Education,* 5 Ill.App.3d 1077.) Courts will not interfere with discretionary authority vested in an agency unless such authority is exercised in an arbitrary or capricious manner. (*People ex rel. Stephens v. Collins,* 35 Ill.2d 499.) Deference is given to findings of fact by an agency with specialized expertise and, when there is ground for legitimate differences of opinion, the agency decision will not be disturbed. (*Motorola, Inc. v. Illinois Fair Employment Practices Com.,* 34 Ill.2d 266; *Brown v. Board of Zoning Appeals,* 21 Ill.App.2d 273.) In light of the above rules, the determination by the Board of an appropriate mixing zone is sustained.

Paragraph 6 of the March 22, 1973, order requires petitioner to post a $25,000 performance bond as part of the general plan of pollution abatement. Paragraph 29 of the stipulation stated that the estimated cost of maintaining the treatment system would be in excess of $25,000. The rationale for the requirement is stated in the opinion:

"Because of the uncertainties involved in Freeman's control pro-

gram, we are requiring Freeman to post a performance bond or other security in the amount of $25,000. This security shall be released by the Agency when and if the Agency certifies that Freeman's discharges are meeting the effluent criterial in Rule 606 of the Mine Related Pollution Regulations, and the Water Quality Standards in Chapter 3: Water Pollution Regulations."

The imposition of a bond is authorized by section 33(b) of the Act, which provides:

"If such order includes a reasonable delay during which to correct a violation, the Board may require the posting of a sufficient performance bond or other security to assure the correction of such violation within the time prescribed."

■■ Petitioner maintains that the requirement of a bond was improper since there was no evidence at the time of the order that the treated discharge was in violation of applicable Board standards and, further, that the terms under which the bond would be released were vague and indefinite, to the prejudice of petitioner. But, petitioner failed to present evidence to the Board to show that the system *was* in compliance with chapters 3 and 4, and in the absence of such evidence, along with the precarious history of malfunctioning in the system, the uncertainty of such compliance justified imposition of the bond.

Petitioner argues that the imposition of a monetary penalty by the Board is unauthorized, citing *Southern Illinois Asphalt Co. v. Environmental Protection Agency,* 15 Ill.App.3d 66 (1974), as controlling. That case has, in effect, been overruled by the decision of the Illinois Supreme Court in *City of Waukegan v. Pollution Control Board,* 57 Ill.2d 170, which held constitutional the legislative grant to the Board of the power to impose fines under section 33(b).

After an exhaustive review of relevant State and Federal authorities and learned treatises and reports, the court in *Waukegan* held that:

"There are adequate standards provided and safeguards imposed on the power given the Board to impose these penalties." 57 Ill.2d at 184.

The court specifically pointed out that the Act separates the investigative prosecuting body (Environmental Protection Agency) from the adjudicative body (Pollution Control Board); that notice must be given of complaints filed with the Board; that respondents before the Board have the right to a public hearing, to counsel, to cross-examine opposing witnesses, to subpoena witnesses, and to the same rules of evidence as apply in civil proceedings; that Board orders are reviewable under the Administrative Review Act; and, finally, that section 33(c) of the Act requires the Board to consider certain factors in reaching its decision:

"(c) In making its orders and determinations, the Board shall take

into consideration all the facts and circumstances bearing upon the reasonableness of the emissions, discharges or deposits involved including, but not limited to:

(i) the character and degree of injury to, or interference with the protection of the leath, general welfare and physical property of the people;

(ii) the social and economic value of the pollution source;

(iii) the suitability of unsuitability of the pollution source to the area in which it is located, including the question of priority of location in the area involved; and

(iv) the technical practibility and economic reasonableness of reducing or eliminating the emissons, discharges or deposits resulting from such pollution source."

Petitioner argues there is no finding in the opinion as to these factors and therefore section 33(c) has not been complied with as required.

■■ The Board is not required to make express findings or to require proof by the Agency relative to each of the factors enumerated in section 33(c), and a prima facie showing by the Agency is sufficient to cause the petitioner to bring forth facts and circumstances bearing upon the reasonableness of its conduct in allowing the inadvertent escape of the offending drain-off. (*Ford v. Environmental Protection Agency,* 9 Ill.App.3d 711, 720-1; *Airtax Products, Inc. v. Pollution Control Board,* 15 Ill.App.3d 238, 244.) Considering all the facts and circumstances concerning the four occasions with which petitioner is charged with violating the various provisions of the numerous enactments involved, there is a paucity of evidence to indicate that the Board complied with all the provisions of section 33(c) in determining a proper penalty. Obviously the Board, which is limited in its penalty powers to $10,000, has not given enough attention to a consideration of a portion of the facts and circumstances, and has chosen to ignore the numerous mitigating facts and circumstances disclosed in the record, to wit: particularly such facts as the size of the pile, its creation and existence long before the Act and numerous rules applicable became effective, the efforts of petitioner to control the situation years before and its continuous efforts to avoid pollution, the expenditures made in such effort and the inadvertence of the violations in light of the physical circumstances.

Obviously, too, the Board has ignored the fact that by its order for a performance bond compliance with the Act and any rules and regulations made by the Board will, as a practical matter, be assured, and that if the plan for preventing pollution which is approved by the Board does not prove to be adequate to serve the purposes of the Act, petitioner will become subject to further orders of the Board and penalties imposed.

In *Meadowlark Farms,* a case similar in nature, but in which prac-

tically no attempt had been made to avoid pollution by the property owner, the Board imposed a penalty of less than $200.

■■ As a result, we conclude the Board's action in imposing the penalty in this case in the amount of $5000 was arbitrary and not supported by the findings made nor by the facts and circumstances present. As a result, we modify the amount of the penalty imposed by reduction of such penalty of $5000 to a penalty of $500.

For the reasons assigned the order of the Pollution Control Board is affirmed, as modified.

EBERSPACHER and CREBS, JJ., concur.