# LEET *v.* MONTGOMERY COUNTY, MARYLAND

[No. 138, September Term, 1971.]

*Decided February 24, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

Harry M. Leet, in proper person.

*William J. Chen, Jr., Assistant County Attorney*, with whom were *Richard S. McKernon, Acting County Attorney, Alfred H. Carter, Deputy County Attorney*, and *Stephen J. Orens, Assistant County Attorney*, on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

In this appeal we are presented with the question of whether Montgomery County (appellee) may legally require a property owner (appellant) to remove at his own expense, pursuant to the terms of local ordinances, abandoned automobiles dumped on his property by trespassers, against his will and without his knowledge.

Harry M. Leet (Leet), the appellant, owns two dairy farms in Montgomery County, one containing 162 acres, known as "Conclusion," located on Old Baltimore Road and the other known as "Rich Meadow," consisting of 244 acres, located on Hoyles Mill Road. Both tracts are zoned RR (Rural Residential). In his statement of facts Leet admits that there were approximately 30 abandoned automobiles, all stripped of any useful equipment or material, together with a substantial amount of broken glass and rubbish dumped on the farms in question. On the "Conclusion" tract the accumulation extended from

the public right of way onto the property for a distance of approximately 50 feet and on the "Rich Meadow" tract for a distance of about 200 feet.

The County filed two bills in equity, one pertaining to each tract, as authorized by Section 87-21 of the Montgomery County Code (1965 ed.) [1] seeking a mandatory injunction, requiring the property owner to abate the condition, alleging that the continued presence of the abandoned automobiles and other trash on the premises violated: (1) Section 111-7 of the County Zoning Ordinance, Montgomery County Code, Vol. 3, Chapter 111, p. 1993 et seq. (1965 ed.) as such a use is not permitted in an RR zone; and (2) Sections 87-4, 87-5 and 87-16(a) of Chapter 87 of the Montgomery County Code. The aforementioned sections all pertain to the unlawful accumulation of rubbish on private property. In this context abandoned motor vehicles are included as rubbish.

The two equity suits were consolidated and after an evidentiary hearing and argument by counsel the chancellor issued a mandatory injunction in each case requiring the property owner to remove "all accumulations of rubbish, trash and refuse," which included the abandoned automobiles. It is from these orders that the property owner appeals.

Among the findings of fact made by the court below were: that approximately five years ago the property owner notified the County Police Department that trespassers were depositing refuse on his land to which the police replied that they could do nothing unless he supplied them with the motor vehicle license numbers of the trespassers; that in the past the property owner had removed refuse from his property at his own expense; that the present accumulation of refuse on the property in question had continued for over a year; that the County gave proper notice to the property owner to remove the abandoned vehicles, trash and refuse, but that he had refused; that the property owner unlawfully

---

1. The enforcement provision of Montgomery County Code, Vol. 2, Chapter 87, "Garbage and Refuse," p. 1559 (1965 ed.).

permitted the accumulation to remain and that the presence of the trash and refuse constitutes a nuisance.

In considering the finding of facts of the chancellor we would add that the record shows that the property owner had on each of two occasions spent over $100 to have abandoned vehicles, which had been dumped on his property by trespassers, removed. There was also evidence that he had made an effort to ascertain the identity of the guilty parties but to no avail. In connection with the latter it should be noted that both farms cover substantial acreage making it extremely difficult to exercise surveillance, particularly during hours of darkness. The record further reveals that Leet had made significant efforts to find people dealing in junk to tow the vehicles away for salvage, or for a reasonable charge, but without success. He also inquired of local service station operators who advertised a towing service about towing them away but no one knew as to where they could be taken for final disposition. In a letter to the County Attorney, Leet recited the fact that the County at one time notified him that it was going to remove the vehicles and charge him for the expense incurred; however, there was no follow-up on this by the County. This letter to the County Attorney, which was filed as an exhibit, further complained that he had paid the County $14.00 to remove two abandoned vehicles dumped by trespassers on a third farm which he owned and that the County had taken no action to accomplish this.

Before discussing the contention of the parties on the merits of the case, it should be noted that a reading of all the various ordinances involved, presents nothing that directly spells out the responsibility of a property owner for rubbish deposited on his property, without his knowledge and against his will by trespassers, unless we view such a situation as coming within the purview of the language of Section 111-7 of the Zoning Ordinance which establishes permissible "uses," of which the accumulation of rubbish or junk in an RR District is not one. However, it takes a rather strained construction of this

section to apply it to the property owner in this case, as he was not responsible for bringing the dumped vehicles onto his property. It would appear that the *use* that was thus being made of the property was by trespassers and not by the property owner or one privy with him. Again, the various sections of Chapter 87 of the County Code which deal with "Garbage and Refuse" appear to apply to volitional acts of, or acquiescence by, the property owner. In Section 87-4 the operative words are, "establish, operate and maintain" a place of disposal for rubbish; in Section 87-5 the words are, "dispose, dump, deposit or leave" rubbish; and Section 87-16 (a) makes it unlawful for the property owner to "store" any refuse, etc. In any event it is difficult to perceive a fair application of these sections to the property owner in the present case.

Indeed, the County espouses the philosophy that the onus of maintaining private property free and clear of all rubbish, as provided by the various ordinances, is one of the burdens incident to the ownership of private property in present day society, regardless as to how the unwanted accumulation may have gotten there. We may have agreed with this conclusion were we only concerned here with the usual random accumulation of trash and litter thoughtlessly thrown away by passers-by. However, under the facts of this case, we are dealing with a problem which differs to such a degree from that which we have just described, that it presents a different face. Here the weight and bulk of the abandoned objects, namely motor vehicles, renders their removal so costly, and their ultimate disposition so difficult, that it is beyond the reasonable capacity of the property owner to rectify the situation without experiencing a financial hardship. We would further add that this is a problem indigenous to a society on wheels.[2]

2. The recognition of this problem as evidence to modern day society is graphically stated in the Council of State Government's pamphlet on "Suggested State Legislation" entitled "Abandoned Motor Vehicles" (1967), published by Council of State Government, Lexington, Ky. 40505.

Understandably, the property owner contends that placing on him the expense of the removing of the abandoned vehicles over which abandonment he had no control, is requiring him, as an individual citizen, to contribute to the public good in a manner which constitutes the taking of his property without just compensation or due process of law in violation of the Fifth and Fourteenth Amendments of the Constitution of the United States, Article 23 of the Declaration of Rights and Article III, § 40 of the Constitution of Maryland.

Although the action taken by the County and the ensuing mandatory injunction issued by the lower court were directed toward the accumulation of rubbish in general, the facts of this case make it manifest that the controversy centers around the disposal of abandoned motor vehicles. There is every reason to believe that had the issue been one solely of rubbish, in the nature of broken glass, old mattresses and things of that kind, found on the property, that Leet would have disposed of these without protest.

The County meticulously traces its authority to enact the various ordinances involved, citing that it is a "Home Rule," "Charter" government county, established pursuant to Article 11 A of the Constitution of Maryland, enjoying all of the express powers granted to it by Article 11 A, § 3 of the Constitution of Maryland and Article 25 A, § 5 of the Maryland Code (1966 Repl. Vol.). It also bottoms its authority on Chapter 780 of the Acts of 1959 (the Regional District Act) which is the enabling zoning legislation applicable to Montgomery County. The County has well documented its argument in this respect and we do not question its general conclusions, but as a matter of relevance we do not see how the authority to pass the various ordinances, heretofore referred to, is challenged in this appeal. We are, however, of the opinion that the effort to apply these ordinances to the facts of the instant case does violence to the constitutional rights of the property owner.

We have no question but that the County would have

properly been entitled to injunctive relief had the property owner used the property for the accumulation of rubbish or had suffered, permitted or consented to the accumulating and dumping of rubbish on his property. It must not be supposed that had the accumulation of rubbish in this case, although dumped upon the property by trespassers, constituted an immediate threat to the health or safety of the surrounding residents, the County would not have been entitled to a mandatory injunction requiring the property owner to abate the nuisance at his own expense. See *Hebron Savings Bank v. City of Salisbury,* 259 Md. 294, 300, 269 A. 2d 597 (1970), wherein Chief Judge Hammond writing for the Court said:

> "Under the police power the State or its authorized agency or subdivision may prevent an owner of property from using it in a manner that inflicts or threatens public harm or from permitting it to remain in a condition to inflict or threaten such harm. Every individual holds his property subject to this power and the power is fundamental and broad enough to require destruction of the property if this is reasonably necessary to insure the public health or safety. In such case the property is deemed a public nuisance and its destruction falls within the power of the State to abate such a nuisance. * * *" 259 Md. at 300.

However, the record fails to reveal any immediate threat to health or public safety; indeed, it showed that the accumulation of rubbish and trash was not composed of putrescible animal or plant matter, there being no evidence that it attracted rodents or vermin. Cf. *Feldstein v. Kammauf,* 209 Md. 479, 487, 121 A. 2d 716 (1956), wherein it was recognized that a junkyard is not a nuisance *per se.* In truth, in the case at bar, the offensive aspect of the accumulation of abandoned vehicles lay solely in its affront to the aesthetic sense. In

*Feldstein* at 488, this Court quoted from *Sinking-Fund Cases,* 99 U. S. 700 (1878) to the effect that, "The courts of this country have with great unanimity held that the police power cannot interfere with private property rights for purely esthetic purposes." Cf. also *City of Baltimore v. Charles Center Parking,* 259 Md. 595, 602, 271 A. 2d 144 (1970), wherein we noted our avoidance of commenting on the validity of municipal regulation of signs for purely aesthetic considerations. On the basis that the accumulation of abandoned motor vehicles on Leet's property does not constitute an immediate threat to public health or safety, we think the chancellor was clearly erroneous in finding that it constituted a nuisance.

Furthermore, the pertinent ordinances as applied by the County, and as implemented by the orders of the court below, required the defendant to remove the abandoned vehicles, placed on his property through no fault of his own, at his expense for the benefit of the public. Although such action is not a direct taking of private property by governmental authority for the public good, without compensation, in that there is no physical invasion or legal taking, nonetheless, the governmental action causes the property owner to spend his resources *pro bono publico.*

In the case before us the property owner relied heavily on *Stevens v. City of Salisbury,* 240 Md. 556, 214 A. 2d 775 (1965). There, the City of Salisbury had passed ordinances under its zoning power which placed limitations on the height of shrubbery, fences, structures and land elevation near street intersections, so as to permit a clear and unobstructed view to the operators of motor vehicles approaching an intersection. The appellant Stevens owned a corner lot which in its natural state had an elevation which violated the limitation of the ordinance. The elevated land was also improved by shrubbery. This Court reversed an order of the lower court which had required the property owner to remove the shrubbery and grade his property to conform with the ordinance at

his expense, and speaking through Chief Judge Prescott, stated:

"* * * We do not believe that subsections 4 and 5 [of the ordinance], which require the owners of dwelling properties to destroy or reduce customary and ordinarily harmless improvements to such properties, at their own expense for the public benefit, can be sustained as reasonable and constitutional provisions." 240 Md. at 573.

The Court in *Stevens* further observed the distinction between the sources of power from which a government draws its authority to destroy private property rights for the immediate protection of the public, as contrasted with its authority to take private property for the purpose of conferring upon the public some type of benefit of public use. In the first instance the police power of the state is the sustaining source, while in the latter instance it is the right of eminent domain, which latter power when exercised, must be accompanied with just compensation to the property owner as a *quid pro quo*. The Court quoted from *Ackerman v. Port of Seattle*, 348 P. 2d 664, 668 (Wash. 1960) to the effect:

"* * * When private property rights are actually destroyed through the governmental action, then police power rules are *usually* applicable. * * * But, when private property rights are taken from the individual and are conferred upon the public for public use, eminent domain principles are applicable." 240 Md. at 565.

Actually, in *Stevens*, while the municipality sought to cloak its actions with the mantle of the police power exercised through the means of a zoning ordinance, this Court held that the municipality had penetrated the area of eminent domain and that there was a "taking" involved which called for compensation to the property owner. In the case at bar it is somewhat more difficult

to classify the power under which the County seeks to act. It would have us believe that it is acting solely within the framework of its police power, and we would agree that the power which it seeks to exercise is more germane to that power than to the power which is derived from the right of eminent domain. However, the situation is complicated by the fact that there is no immediate threat to the public health and safety, no nuisance being involved, and that which the County seeks to have the property owner accomplish, at his own expense, while not being "for public use," nonetheless is for the benefit of the general public.[3] This latter facet casts a complexion on the matter which places this exercise of power somewhat beyond the conventional concept of the exercise of the police power. Indeed, we would find the solution to this problem more perplexing, as presented by these facts, if it were not for the language found in the opinion of this Court in *Capital Transit Company v. Bosley*, 191 Md. 502, 62 A. 2d 267 (1948). There, the Public Service Commission had ordered the Capital Transit Company to reduce its schedule of rates to provide a three cent fare for school children. The company demonstrated that it was already operating at a deficit and that such a fare would cause an additional loss. In reversing the order of the Commission, Judge Markell (later Chief Judge) writing for the Court, artfully stated:

> "The 'police power', at most, is the power of
> government. Exercise of this power sometimes

---

**3.** During the argument of this case the suggestion was made that the action by the municipality constituted "inverse" or "reverse" condemnation which this Court had occasion to discuss briefly in MacLeod v. City of Takoma Park, 257 Md. 477, 481, 263 A. 2d 581 (1970). However, as may be gathered from a reading of our discussion in MacLeod, we do not think that the facts of this case adapt themselves to the application of that doctrine. For a full discussion of "inverse" or "reverse" condemnation see "Reverse Eminent Domain: A New Look and Re-definition" 47 Ky. L. J. 215 and "Claims Against the State of Kentucky-Reverse Eminent Domain," 42 Ky. L. J. 163. A reading of these articles establishes that the injury to the property owner must be incident to some construction or operation of a public enterprise.

causes uncompensated expense. But the State itself cannot under the guise of the police power take private property for public use without compensation. Its power to provide, and pay for, transportation for school children (*Board of Education v. Wheat*, 174 Md. 314, 199 A. 628) cannot be exercised by compelling, without paying for, transportation by plaintiff." 191 Md. at 514.

In *Bosley,* it is obvious that there was no "taking" in the usually accepted sense of that act, in that there was no invasion of private property, no physical acquisition or legal taking by the state, nonetheless, there was an effort by the state to compel the private party to use its funds and resources to confer a benefit on the public. We think the same reasoning which recognized such actions as a "taking" in *Bosley,* by analogy, is apposite here.

We think the concept of a "taking" as expressed in *Bosley* was restated by this Court in *Stevens,* when we said:

"The appellee counters by arguing that the ordinance calls for no physical invasion of the properties involved; hence there can be no taking thereunder in a legal sense. In the view that we take of the case, it will be unnecessary to decide this question, for we shall assume, without deciding, that there can be, under proper circumstances, a taking in a constitutional sense, even though there be no direct encroachment upon private property." 240 Md. at 566.

*Orders reversed, appellee to pay costs.*