961 A.2d 557

## VNA HOSPICE OF MARYLAND

v.

## DEPARTMENT OF HEALTH AND MENTAL HYGIENE.

### No. 105, Sept. Term, 2007.

Court of Appeals of Maryland.

Dec. 11, 2008.

586

Stephen J. Sfekas, Baltimore, for petitioner.

Kathleen A. Ellis, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, and David Wagner, Staff Attorney, Baltimore), on brief, for respondent.

Argued before BELL, C.J., RAKER,* HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE (Retired, specially assigned), and DALE R. CATHELL (Retired, specially assigned), JJ.

---

* Raker, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

John C. ELDRIDGE, J., Retired, Specially Assigned.

This is an action for judicial review of a final adjudicatory administrative decision by the Maryland Department of Health and Mental Hygiene. In that decision, the Department amended the petitioner VNA Hospice of Maryland's hospice care license to exclude VNA from providing home-based hospice services in Carroll and Prince George's Counties. The decision was based upon Maryland Code (2000, 2005 Repl. Vol.), § 19–906(c)(3) of the Health–General Article.[1] In deciding to rescind that part of VNA's license relating to Carroll and Prince George's Counties, the Department rejected VNA's interpretation of § 19–906(c)(3) of the Health–General Article. The Department also rejected VNA's alternative arguments that, if § 19–906(c)(3) precluded VNA from performing home-based hospice services in Carroll and Prince George's Counties, the statute as applied to VNA was unconstitutional on several grounds.

The Circuit Court for Baltimore County reversed the administrative decision on state constitutional grounds. The Court of Special Appeals, however, rejected VNA's constitutional arguments, reversed the Circuit Court's judgment, and directed the Circuit Court to affirm the Department's final decision. *Dept. of Health v. VNA,* 176 Md.App. 475, 501–502, 933 A.2d 512, 527 (2007).

This Court granted VNA's petition for a writ of certiorari which presented numerous constitutional questions. *VNA Hospice v. Department of Health,* 402 Md. 355, 936 A.2d 852 (2007). Although we recognize that some of VNA's constitutional arguments are substantial, we shall not decide any of the constitutional issues. Instead, we shall vacate the decision of the Court of Special Appeals and direct an affirmance of the

---

**1.** Section 19–906(c)(3) of the Health–General Article, enacted as part of Ch. 404 of the Acts of 2003, provides as follows:

"(3) A general hospice may not be licensed to provide home-based hospice services in a jurisdiction unless the general hospice or an entity acquired by the general hospice provided home-based hospice services to a patient in the jurisdiction during the 12–month period ending December 31, 2001."

Circuit Court's judgment on the ground that the Department's interpretation of the statutory provisions, and particularly § 19–906(c)(3), was not legally correct.

## I.

VNA, before the Department's action complained of here, was licensed to provide and had been providing home-based hospice services, to "dying individuals and their families," [2] in Anne Arundel, Baltimore, Carroll, Cecil, Harford, Howard, and Prince George's Counties, as well as Baltimore City. As a result of the Department's final decision in this case, VNA could no longer provide home-based hospice services in Carroll and Prince George's Counties unless it applied for and received a Certificate of Need (hereafter sometimes referred to as a "CON").

Since 1982, hospice care programs have been included in Maryland's health care planning statutory definition of "health care facility." Maryland Code (2000, 2005 Repl. Vol.), § 19–114(d)(1)(vii) of the Health–General Article. Also since 1983, new facility-based hospice care programs have been required to have a Certificate of Need and to meet licensing requirements. Many pre-existing hospice providers, although still having to meet the licensing requirements, were "grandfathered" with respect to the CON requirement because of an uncodified provision, in a 1987 statute, exempting existing programs. Ch. 670 of the Acts of 1987, § 2, stated

> "[t]hat those hospice care programs in existence and delivering hospice care services before January 1, 1987, that request licensure between July 1, 1987, and July 1, 1988, shall not be required to obtain a certificate of need prior to licensure. However, those hospice care programs seeking exemption from formal submission of a certificate of need for a hospice care program under this section shall meet the criteria established by the Maryland Health Resources

---

**2.** See Maryland Code (2000, 2005 Repl. Vol.), § 19–901(d) and (f) of the Health–General Article.

Planning Commission in consultation with interested groups, including the Hospice Network of Maryland, Inc., for determining whether a hospice care program was in existence and delivering hospice care services before January 1, 1987." [3]

As more requirements were subsequently added in order to obtain a CON for a hospice program, existing programs continued to benefit from grandfathering provisions. This history was described by the Maryland Health Care Commission, Division of Health Resources, in a report entitled *An Analysis and Evaluation of Certificate of Need Regulation in Maryland, Working Paper: Hospice Services*, at 23–24 (2000), as follows (footnotes omitted):

"Since the enactment of the statute creating the former Maryland Health Resources Planning Commission in 1982, hospice care programs (as well as home health agencies) have been included in the definition of 'health care facility' for purposes of coverage by CON review requirements. However, since most home health agencies and virtually all hospice programs existing at that time had been created by hospitals or nursing homes as a facility-based medical service, statutory language was added at several junctures over the next several years to clarify that any geographic expansion (beyond their current jurisdictions) by an existing hospice or home health agency required an additional CON.

---

**3.** At the time this statute was enacted, the Maryland Health Resources Planning Commission, an agency within the Maryland Department of Health and Mental Hygiene, administered the CON regulations for the hospice care program. In 1999, the Health Resources Planning Commission merged with another agency in the Department to form the Maryland Health Care Commission. The Maryland Health Care Commission "is an independent commission that functions in the Department." Maryland Code (2000, 2005 Repl. Vol., 2008 Supp.), § 19–103(b) of the Health–General Article. The issuance of a CON for a hospice, as defined in § 19–901 of the Health–General Article, falls within the Health Care Commission's jurisdiction. *See* §§ 19–114(c) and (d)(vii), and § 19–120, of the Health–General Article. The *licensing* of hospices, however, falls within the jurisdiction of the Secretary of Health and Mental Hygiene. *See* § 19–905 of the Health–General Article.

Existing programs of both kinds rushed to be 'grandfathered' as these successive additions to Commission and licensing law established additional requirements.

"Since Medicare did not include hospice care as a covered service until the 1983 effective date of the Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982, followed by Medicaid's adding the benefit in 1985, relatively few freestanding hospices existed at the time of the 1984 amendments to statute. The imposition of a separate State licensure requirement for hospice programs in 1987 was an indicator of the program's growth, and the increasing interest of freestanding providers. This new law explicitly stated that, except for a program with a limited license, a person seeking licensure 'shall have a certificate of need ... for the hospice program to be operated.'

"Uncodified language in the 1987 licensure statute provided that hospice care programs established without CON approval, 'in existence and delivering hospice care services before January 1, 1987' that sought State licensure between July 1, 1987 and July 1, 1988 would 'not be required to obtain a Certificate of Need prior to licensure.'"

The report continued (*id.* at 24):

"Since hospice programs that existed before either the CON or the licensure requirement had no geographic limitation on their service area, once grandfathered, this service area was determined to be statewide. This was reinforced by the argument that since nearly all of these pre-existing hospice programs had been established as medical services within hospitals or nursing homes, which may serve a resident of any Maryland jurisdiction (and in the case of facilities with specialized services, often draw patients from across the state), the determination that their hospice programs had similar geographic scope. Even when, beginning in the early 1990s, corporate tax advantages, changed reimbursement rules, or mergers with other facilities provided incentive to 'spin off' facility-based hospice services into a freestanding, though usually still affiliated program, this

determination of 'statewide authority' to serve patients was found still to apply."

As explained above, licensed hospice programs that qualified under grandfathering provisions were authorized to provide services throughout the State of Maryland. Moreover, because hospice care programs were, and are, freely transferable, a provider seeking to serve the entire State of Maryland could simply acquire one of the grandfathered, CON-exempted licenses, and thereby acquire a license allowing it to serve the entire State without meeting the CON requirements.

Consequently, CON-exempt licenses allowing providers to serve the entire State became a highly valued commodity. In one transaction, described in the Department of Legislative Services' Bill File on Senate Bill 732 of the 2003 General Assembly's legislative session, a program licensed to provide state-wide services without a CON was transferred to a large out-of-state organization, which then announced its intention to expand the program's capacity to serve more people in more areas of Maryland than any of the previous owners of that program. To address the competition felt by smaller local hospices competing with these larger providers, Senate Bill 732 was introduced at the 2003 Session of the General Assembly. One member of the Senate supporting the Bill, in testimony before the Senate Finance Committee on March 6, 2003, testified that it was "these little hospices around the State that we are trying to protect." [4]

Senate Bill 732 was enacted, and signed by the Governor on May 22, 2003, as Ch. 404 of the Acts of 2003. The effective date of Ch. 404 was July 1, 2003. The Act added several new provisions to Title 19 of the Health–General Article, which were designed to address some of the previously discussed matters. For example, new § 19–120(k)(5)(ii) provided that

---

**4.** Testimony before the Senate Finance Committee regarding Senate Bill 732, on March 6, 2003, contained in a CD on file at the Department of Legislative Services, Office of Policy Analysis, Library and Information Services.

"the purchaser of the general hospice may only acquire the authority to provide home-based hospice services in jurisdictions in which the seller of the general hospice is licensed to provide home-based hospice services."

New § 19–120(*o*) also stated:

"The Commission may not issue a certificate of need or a determination with respect to an acquisition that authorizes a general hospice to provide home-based hospice services on a statewide basis."

With regard to the dispute in the present case, the key provision added by Ch. 404 of the Acts of 2003 was § 19–906(c)(2) and (3) which stated as follows:

"(2) The Secretary, in consultation with the Maryland Health Care Commission, shall specify those jurisdictions in which a general hospice is authorized to provide home-based hospice services.

"(3) A general hospice may not be licensed to provide home-based hospice services in a jurisdiction unless the general hospice or an entity acquired by the general hospice provided home-based hospice services to a patient in the jurisdiction during the 12–month period ending December 31, 2001."

As previously mentioned, subsection (3) above was the basis for the Department's decision which rescinded that portion of VNA's license relating to Carroll and Prince George's Counties, thereby precluding VNA from performing home-based hospice services in those two jurisdictions.[5]

## II.

In a letter dated August 18, 2003, the Department of Health and Mental Hygiene notified VNA that, because of the enactment of § 19–906(c)(3), "this letter amends your license to

---

**5.** Section 19–906(c)(4) created a few limited exceptions to § 19–906(c)(3), including the ability of a general hospice to apply for a CON to perform home-based hospice services in a previously excluded jurisdiction. None of these limited exceptions is applicable under the facts of this case.

show that you are authorized to provide hospice services only" in "Anne Arundel [County], Baltimore City, Baltimore [County], Cecil [County], Harford [County], [and] Howard [County]." The letter asserted that these jurisdictions were the only ones in which VNA had performed hospice services in the year 2001. The Department's letter also stated that, if VNA disagreed with the amendment restricting its license, it could request a hearing by writing to the Maryland Office of Administrative Hearings. Three days later, VNA sent a letter to the Office of Administrative Hearings and the Department stating that it had provided to the State "statistics ... demonstrating that services had been provided by VNA to patients in Carroll and Prince George's [C]ounties in 2001." VNA requested a hearing to be conducted by the Office of Administrative Hearings.

The hearing was held on October 31, 2003, before an Administrative Law Judge (ALJ) of the Office of Administrative Hearings. There was no testimony from witnesses. Instead, the matter was tried on a detailed stipulation of facts submitted by counsel for VNA and counsel for the Department, various exhibits, affidavits, legal memoranda, and oral argument by counsel for each side. VNA argued that, under a correct interpretation of Title 19, Subtitle 9, of the Health-General Article, consisting of § § 19–901 through 19–913, VNA did provide home-based hospice services in Carroll and Prince George's Counties in 2001. The dispute between VNA and the Department regarding this issue was not a factual dispute; all of the underlying facts concerning VNA's activities with respect to Carroll and Prince George's Counties were agreed upon. Instead, the dispute concerned the correct interpretation of the statutory provisions. The disputed statutory interpretation issue was whether VNA's provision of home-based bereavement services to family members of the dying or deceased persons, in Carroll and Prince George's Counties during the year 2001, constituted the provision of "home-based hospice services to a patient in" those Counties within the meaning of § 19–906(c)(3).

VNA argued before the ALJ that the provision of bereavement services to family members qualified under the statute, whereas the Department contended that the only services which qualified under § 19–906(c)(3) were services rendered to the dying person. VNA alternatively argued that, if the Department's interpretation of the statute were correct, § 19–906(c)(3), as applied to VNA under the circumstances of this case, was unconstitutional. VNA relied on the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights. VNA also maintained that, as interpreted by the Department, § 19–906(c)(3) effected the taking of VNA's property right without just compensation, in violation of the Taking Clause of the Fifth Amendment, as well as in violation of Article III, § 40, of the Maryland Constitution and Article 24 of the Maryland Declaration of Rights, as applied in *Dua v. Comcast Cable*, 370 Md. 604, 805 A.2d 1061 (2002).[6] These were the principal constitutional arguments made, although VNA did raise some additional issues under the Maryland Constitution.

The ALJ rendered an extensive Proposed Decision and a separate Recommended Order on January 15, 2004. The Findings of Fact in the Proposed Decision, based upon the stipulation and other documents submitted, consisted of several pages delineating in detail the home-based hospice services which VNA Hospice provided in Carroll and Prince George's Counties, during the year 2001, to family members of deceased persons. As set forth in the ALJ's factual findings, for example, a Carroll County resident was referred to VNA

---

6. Article III, § 40, of the Maryland Constitution provides as follows:
"**Section 40. Eminent domain.**
"The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation."
Article 24 of the Maryland Declaration of Rights states:
"**Article 24. Due process.**
"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

Hospice "for hospice services" on December 5, 2000. VNA Hospice "did an evaluation of the" person "and developed a plan of care" which included "a bereavement plan of care to provide services" after the person's death to the person's "significant other" and her father who lived in Carroll County. According to the ALJ, "[b]ereavement services of up to one year after the death ... are a core service under the Medicare program and are reimbursed" at the same rate as services to the deceased. The deceased died on December 8, 2000, and VNA Hospice provided bereavement services, in accordance with the plan, to the "significant other" and the father in Carroll County during the year 2001. The ALJ's Findings of Fact described five other situations, involving five other Carroll County residents who died in the year 2000, where VNA Hospice during the year 2001 provided bereavement services to the deceased persons' families in Carroll County. In addition, the ALJ's Findings of Fact described a similar situation where VNA Hospice provided bereavement services during 2001 to the deceased's mother in Prince George's County.

After setting forth the factual findings, the ALJ first turned to the statutory interpretation issue and rejected VNA's interpretation of § 19–906(c)(3). The ALJ, largely relying upon the phrase "services to a patient" in subsection (c)(3), interpreted the language to mean that bereavement services to the deceased's family in a county of their residence failed to qualify under the subsection. The ALJ placed particular emphasis on the use of the word "to" rather than the word "for." Thus, the ALJ explained as follows:

"The literal meaning of the words, 'services to a patient in the jurisdiction' supports the Department's interpretation of the statutory provision in dispute. The Appellant's suggested interpretation would have the ALJ read the statutory language as hospice services 'for' not 'to' a patient. The ordinary and natural import of the words 'to a patient' seem inconsistent with the Appellant's suggested interpretation. It does not seem apparent from the literal meaning of the text, that Legislators who enacted the statute would have

contemplated services to family members after the patient died as qualifying 'services to a patient in the jurisdiction.' "

Although the ALJ referred to numerous rules of statutory construction, and later discussed the constitutional issues at length, the ALJ did not mention the principle that "the preferred construction [of a statute] is that which avoids the determination of constitutionality." *Curran v. Price*, 334 Md. 149, 172, 638 A.2d 93, 104–105 (1994).

The ALJ next rejected all of VNA's constitutional arguments, generally relying upon the principle that "[a] presumption of constitutionality attaches to any act of the Legislature." With respect to VNA's Taking and Due Process arguments, the ALJ held that VNA had no "property right" under its license, saying:

> "The Appellant is not engaged in a common occupation or calling. The Appellant is a provider of hospice care. There is a significant difference between a provider of hospice care, a regulated industry integrally involved with public health, and the occupation of crabbers or oystermen [whose property rights were involved in cases relied on by VNA]."

The ALJ also stated that VNA's reliance on *Dua v. Comcast Cable, supra,* 370 Md. 604, 805 A.2d 1061, was "misplaced" because, in addition to VNA's license not constituting a "property right," Ch. 404 of the Acts of 2003 "applies prospectively." The ALJ's Recommended Order was that the decision amending VNA's license to exclude the performance of hospice services in Carroll and Prince George's Counties "be upheld."

VNA filed with the Secretary of Health and Mental Hygiene exceptions to the ALJ's Proposed Decision. A designee of the Secretary considered the exceptions and, on June 21, 2004, "adopt[ed] all of the proposed Findings of Fact and Conclusions of Law set forth in the [ALJ's] Proposed Decision," and upheld the original decision "to amend VNA's hospice care license to exclude VNA from providing home-based hospice services in Carroll and Prince George's Counties pursuant to" § 19–906(c)(3) of the Health–General Article. The Board of Review of the Department of Health and Mental Hygiene,

after hearing oral argument, filed on October 13, 2004, a brief order affirming the Secretary's decision. This was the final administrative decision.

VNA brought, in the Circuit Court for Baltimore County, an action for judicial review of the Department's decision. The Circuit Court reversed the administrative decision on the ground that VNA's license to provide home-based hospice services in Carroll and Prince George's Counties was a property right, and that § 19–906(c)(3), as applied to VNA, constituted the taking of a property right without just compensation in violation of Article III, § 40, of the Maryland Constitution and Article 24 of the Maryland Declaration of Rights, as applied in *Dua v. Comcast Cable, supra,* 370 Md. 604, 805 A.2d 1061. With regard to some of the other grounds argued, the Circuit Court stated that the use of the 2001 date, in a statute enacted in 2003, was "arbitrary" and a "retroactive application," "and raises serious concerns regarding the constitutional validity of 19–906(c)(3)." The Circuit Court did not reach any of the federal constitutional issues raised, or the other state constitutional grounds, or the statutory interpretation issue.

The Department appealed to the Court of Special Appeals, arguing that the Circuit Court erred and that § 19–906(c)(3) was constitutional. VNA, as appellee, relied upon all of the same constitutional arguments that it had made in the administrative proceedings and before the Circuit Court. Regarding the statutory interpretation issue, however, VNA expressly stated in its brief that "VNA is not raising this issue in this appeal." (Appellee's brief in the Court of Special Appeals at 2, n. 1). The Court of Special Appeals held "that HG § 19–906(c)(3) is not unconstitutional on any of the grounds asserted by VNA. We therefore reverse the judgment of the circuit court with the direction that it affirm the Final Decision of the Department." *Dept. of Health v. VNA, supra,* 176 Md.App. at 479, 933 A.2d at 514.

VNA filed in this Court a petition for a writ of certiorari, raising all of the constitutional issues which it had previously raised. VNA did not include in its certiorari petition the

statutory interpretation issue, which had been its primary argument during the administrative proceedings. The Department did not file a cross-petition for a writ of certiorari. As stated earlier, this Court granted the petition.

## III.

The constitutional arguments made by VNA throughout this case, and repeated in its certiorari petition and brief in this Court, are neither organized very well nor always separately delineated. Nevertheless, some of them are substantial.

VNA's principal argument is that § 19–906(c)(3) of the Health–General Article effected a taking of the petitioner's property right without just compensation in violation of Article III, § 40, of the Maryland Constitution and Article 24 of the Maryland Declaration of Rights, in light of the principles set forth in *Dua v. Comcast Cable, supra,* 370 Md. 604, 805 A.2d 1061. Interspersed within this argument, however, is the contention that § 19–906(c)(3) "violates the [petitioner's] substantive due process rights." (Petitioner's brief at 7). Thus, the petitioner argues that the statute does not relate to "the public's health, safety or welfare," that Article 24 of the Maryland Declaration of Rights protects "a *substantive right* as well as vested property rights" and petitioner's "substantive right" was violated, and that § 19–906(c)(3) represents an "exercise of arbitrary power." *(Id.* at 5, 7, 9, 11, 13).[7]

---

7. There are, of course, significant differences between an unconstitutional "taking" in violation of Article III, § 40, of the Maryland Constitution and Article 24 of the Maryland Declaration of Rights, and a violation of the so-called "substantive due process" doctrine under Article 24 of the Declaration of Rights. It is somewhat similar to the difference, in the United States Constitution, between a violation of the Taking Clause of the Fifth Amendment and a violation of so-called "substantive due process" principles under the Due Process Clause of the Fifth Amendment. *Compare, e.g., Eastern Enterprises v. Apfel,* 524 U.S. 498, 503–538, 118 S.Ct. 2131, 2137–2153, 141 L.Ed.2d 451 (1998) (plurality opinion) with 524 U.S. at 539–550, 118 S.Ct. at 2154–2161, 141 L.Ed.2d at 481 (Kennedy, J., concurring in part and dissenting in part).

While in certain situations, this Court's "taking" cases rest on both Article III, § 40, of the Maryland Constitution and Article 24 of the

The petitioner also relies upon, and quotes extensively from, leading procedural due process cases and equal protection cases. In addition, VNA asserts that § 19–906(c)(3) creates a monopoly in violation of Article 41 of the Maryland Declaration of Rights. Finally, the petitioner takes the position that, wholly separate from the limitations upon governmental power under "taking" principles, or under the "substantive due process" doctrine, or under the other constitutional principles mentioned above, an enactment of the General Assembly must be within the "police power" and that

---

Declaration of Rights, the reference to Article 24 should not be construed as mixing "taking principles" with the doctrine of "substantive due process." This Court in *Dua v. Comcast Cable*, 370 Md. 604, 629–630, 805 A.2d 1061, 1076 (2002) explained as follows:

"In light of this Court's opinions, it is clear that retrospective statutes abrogating vested property rights (including contractual rights) violate the Maryland Constitution. To reiterate, the central issue, in cases like the present ones, is whether vested rights are violated and not whether the retroactive statutes are 'rational.' The Court's opinions indicate that the particular provisions of the Constitution which are violated by such acts are Article 24 of the Declaration of Rights and Article III, § 40, of the Constitution. Furthermore, these constitutional provisions literally cover the matter. A statute having the effect of abrogating a vested property right, and not providing for compensation, does 'authoriz[e] private property, to be taken . . ., without just compensation' (Article III, § 40). Concomitantly, such a statute results in a person or entity being 'deprived of his . . . property' contrary to 'the law of the land' (Article 24)."

The *Dua* opinion continued (370 Md. at 630, n. 9, 805 A.2d at 1076, n. 9):

"We recognize that, in some contexts, there are differences between the analyses applied when determining whether particular governmental action constituted an unconstitutional deprivation of property in violation of Article 24 of the Declaration of Rights and an unconstitutional taking of property in violation of Article III, § 40, of the Maryland Constitution. Nevertheless, there are also situations involving an overlap, where this Court has held that the same governmental action violates both Article 24 and Article III, § 40. *See* the discussions in *Md.-Nat'l Cap. P. & P. Comm'n v. Chadwick*, 286 Md. 1, 8–18, 405 A.2d 241, 244–250 (1979); *Bureau of Mines v. George's Creek*, 272 Md. 143, 156–165, 321 A.2d 748, 755–760 (1974); *Arnold v. Prince George's Co.*, 270 Md. 285, 294, 311 A.2d 223, 228 (1973); *Leet v. Montgomery County*, 264 Md. 606, 611–616, 287 A.2d 491, 494–497 (1972). The opinions of this Court, holding that retrospective statutes impairing vested rights are unconstitutional, are

§ 19–906(c)(3) is not "a valid exercise of the police powers." (*Id.* at 24–27). In other words, the petitioner views the so-called "police power" as a separate and independent restriction upon the General Assembly's power to legislate.[8]

clearly based on both Article 24 of the Maryland Declaration of Rights and Article III, § 40, of the Maryland Constitution.

8. The entire authority relied upon for this theory consists of five cases, three of which invalidated governmental action under the equal protection component of Article 24 of the Maryland Declaration of Rights (*Frankel v. Board of Regents*, 361 Md. 298, 761 A.2d 324 (2000); *Verzi v. Baltimore County*, 333 Md. 411, 635 A.2d 967 (1994); *Attorney General v. Waldron*, 289 Md. 683, 703–728, 426 A.2d 929, 940–954 (1981)), one of which rejected a "substantive due process" challenge to a state statute, based upon Article 24 of the Maryland Declaration of Rights and the Due Process Clause of the Fourteenth Amendment (*Dawson v. State*, 329 Md. 275, 282–290, 619 A.2d 111, 114–118 (1993)), and one of which rejected the argument that the government's destruction of the appellants' wild animal constituted a taking of property without paying just compensation in violation of Article III, § 40, of the Maryland Constitution, and the Taking Clause of the Fifth Amendment (*Raynor v. Dept. of Health*, 110 Md.App. 165, 183–193, 676 A.2d 978, 987–992 (1996)), *certs. denied*, 343 Md. 679, 684 A.2d 454 (1996), 520 U.S. 1166, 117 S.Ct. 1428, 137 L.Ed.2d 537 (1997).

There is no provision in either the United States Constitution or the Maryland Constitution stating that a legislative enactment must be within the "police power" of government, or limiting the General Assembly's legislative authority to proper exercises of the "police power," or providing that legislation constituting an "abuse of the police power" is void. Historically, the phrase "police power" has been used to signify residual governmental power which does not violate particular limitations set forth in the United States or Maryland Constitutions. *See, e.g., Brown v. Maryland*, 12 Wheat. 419, 443–444, 6 L.Ed. 678, 687 (1827) (authority of Maryland to regulate imported merchandise without violating the Commerce Clause or the "Imposts or Duties on Imports" Clause); *New York v. Miln*, 11 Pet. 102, 132–143, 9 L.Ed. 648, 660–664 (1837) ("police power" used to describe the power of state governments over commerce-related areas, which had not been preempted by the Commerce Clause); *Stone v. Mississippi*, 101 U.S. 814, 817–818, 25 L.Ed. 1079, 1079–1080 (1879) (The "police power" was the authority of state governments, with regard to contractual arrangements, which did not violate the federal Impairment of Contracts Clause); *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 440, 54 S.Ct. 231, 241, 78 L.Ed. 413, 430 (1934) (same); *Lake Roland Elevated Railway Co. v. Baltimore*, 77 Md. 352, 380–381, 26 A. 510, 515–516 (1893) (same); *Allgeyer v. Louisiana*, 165 U.S. 578, 589–593, 17 S.Ct. 427, 432, 41 L.Ed. 832, 836–837 (1897) (State statute interfered with a person's "liberty to contract," depriving the person of "due process of law," and thus the statute was not within the State's

■ Although some of VNA's constitutional arguments may lack merit, this is not true of others. For example, while "[t]he right to practice [an occupation] is a property right of which [one] cannot be deprived without due process of law," it is subject to the " 'regulatory power' " of the State. *Comm'n on Medical Discipline v. Stillman,* 291 Md. 390, 405–406, 435 A.2d 747, 755 (1981). *See also Aitchison v. State,* 204 Md. 538, 544–545, 105 A.2d 495, 498, *cert. denied,* 348 U.S. 880, 75 S.Ct. 116, 99 L.Ed. 692 (1954). Neither these nor similar cases in this Court, however, have involved the revocation, in whole or in part, of a license to engage in an occupation based upon a licensee's conduct years in the past, which conduct was lawful, proper, and free of any fault at the time when it took place. The Circuit Court, in a comprehensive opinion, held that, under the circumstances of this case, the partial revocation of the license constituted the taking of a property right without just compensation in violation of Article III, § 40, of the Maryland Constitution and Article 24 of the Maryland Declaration of Rights.

---

legitimate "exercise [of] its police power"); *Lochner v. New York,* 198 U.S. 45, 53–54, 25 S.Ct. 539, 541–542, 49 L.Ed. 937, 940–941 (1905) (same); *Davis v. State,* 183 Md. 385, 396–398, 37 A.2d 880, 887 (1944) (A Maryland statute, regulating advertising by physicians and surgeons, did not "violate[ ] the due process clause of the Federal Constitution" and, accordingly, it was a "valid exercise of the police power"); *Stevens v. City of Salisbury,* 240 Md. 556, 563–567, 214 A.2d 775, 778–781 (Zoning ordinance did not effect an unconstitutional taking of property without just compensation, and therefore it was "a proper exercise of the State's 'police power' ").

Since the "police power" simply refers to governmental action not precluded by any specific provision in the Federal or State Constitutions, it has little or no useful meaning. *See Baltimore Gas and Electric Co. v. State Roads Com'n,* 214 Md. 266, 278, 134 A.2d 312, 317 (1957) (where Judge Hammond, later Chief Judge, deemed the phrase "almost useless"). As our cases have said, the "police power" is " 'no more than the power to govern,' " *Stevens v. City of Salisbury, supra,* 240 Md. at 564, 214 A.2d at 779. *See also Allied American Mutual Ins. Co. v. Commissioner of Motor Vehicles,* 219 Md. 607, 616, 150 A.2d 421, 427 (1959); *Tighe v. Osborne,* 149 Md. 349, 356, 131 A. 801, 803 (1925). Moreover, "States are independent sovereigns with *plenary* authority to make ... laws as long as they do not infringe on federal [or state] constitutional guarantees." *Danforth v. Minnesota,* 552 U.S. ——, 128 S.Ct. 1029, 1041, 169 L.Ed.2d 859, 871 (2008) (emphasis added).

The procedural due process issue presented by the application of § 19–906(c)(3) under the circumstances here may be even more substantial. There is obviously an unfairness in revoking a license pursuant to a statute enacted in 2003 because of entirely lawful and proper events in 2001—events which in no manner involved any fault, error, negligence, improper conduct, or anything similar, on the part of the petitioner.

When § 19–906(c)(3) was enacted in 2003, requiring certain conditions to have happened in 2001 in order to retain a license to operate in particular counties, it was impossible for the petitioner to comply with the conditions. An analogous hypothetical would be for this Court, in the year 2008, to promulgate a rule providing that a member of the Maryland Bar could practice law, without having to take and pass the bar examination for a second time, only in those Maryland counties where the lawyer practiced law in the year 2006. Few, if any, Maryland lawyers would consider that such a rule was fair.

At the oral argument in this case, the attorney for the Department conceded that a "license[ ] to provide home-based hospice services in a jurisdiction" (§ 19–906(c)(3) of the Health–General Article) is a "property right" for purposes of procedural due process. *See also, e.g., Barry v. Barchi,* 443 U.S. 55, 64, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365, 375 (1979) ("[I]t is clear that Barchi had a property interest in his license sufficient to invoke the protection of the Due Process Clause"); *Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90, 94 (1971) ("[L]icenses are not to be taken away without that procedural due process required by the Fourteenth Amendment"); *Motor Vehicle Administration v. Lytle,* 374 Md. 37, 70, 821 A.2d 62, 81 (2003) ("[A] driver's license is a property interest protected by both the Fourteenth Amendment to the U.S. Constitution and Art. 24 of the Maryland Declaration of Rights").

■ Generally, procedural due process requires notice and some form of hearing or opportunity to respond if one is to be

deprived of a property right by governmental action. *See, e.g., Bell v. Burson, supra,* 402 U.S. at 540–543, 91 S.Ct. at 1590–1591, 29 L.Ed.2d at 95–97; *Goldberg v. Kelly,* 397 U.S. 254, 268–271, 90 S.Ct. 1011, 1020–1022, 25 L.Ed.2d 287, 299–301 (1970); *Rhoads v. Sommer,* 401 Md. 131, 163, 931 A.2d 508, 526–527 (2007); *St. George Church v. Aggarwal,* 326 Md. 90, 94–95, 603 A.2d 484, 486–487 (1992); *Department of Transportation v. Armacost,* 299 Md. 392, 418–420, 474 A.2d 191, 204–205 (1984); *Pitsenberger v. Pitsenberger,* 287 Md. 20, 29–31, 410 A.2d 1052, 1058–1059, *appeal dismissed,* 449 U.S. 807, 101 S.Ct. 52, 52–53, 66 L.Ed.2d 10 (1980); *Barry Properties v. Fick Bros. Roofing Company,* 277 Md. 15, 33, 353 A.2d 222, 233 (1976).

In the present case, however, because the deprivation of a property right was retroactively based on a condition, occurring years in the past, the petitioner did not have, and could not have had, notice that it must perform home-based hospice services in certain geographical areas in the year 2001 in order to retain its license to perform home-based hospice services in those areas.

While we reach no conclusions concerning the taking of a vested property right or a denial of procedural due process, it is obvious that the ALJ's and Department's interpretation of § 19–906(c)(3) presents substantial taking and procedural due process issues. Their interpretation clearly raises doubts about the constitutionality of the statute.

### IV.

■ This Court has emphasized, time after time, that the Court's "strong" and " 'established policy is to decide constitutional issues only when necessary.' " *Burch v. United Cable,* 391 Md. 687, 695–696, 895 A.2d 980, 984–985 (2006), quoting *Mercy Hospital v. Jackson,* 306 Md. 556, 565, 510 A.2d 562, 566 (1986). To the same effect, *see, e.g., Abrams v. Lamone,* 398 Md. 146, 215, 919 A.2d 1223, 1266 (2007); *Christopher v. Dept. of Health,* 381 Md. 188, 217, 849 A.2d 46, 63 (2004) ("[W]e 'adhere [ ] to the established principle that a court will

not decide a constitutional issue when a case can properly be disposed of on a non-constitutional ground,'" quoting *Murrell v. Baltimore*, 376 Md. 170, 191 n. 8, 829 A.2d 548, 560 n. 8 (2003); *Teachers Union v. Board of Education*, 379 Md. 192, 206, 840 A.2d 728, 736 (2004); *Jordan v. Hebbville*, 369 Md. 439, 461 n. 20, 800 A.2d 768, 781 n. 20 (2002); *Farrell v. State*, 364 Md. 499, 506, 774 A.2d 387, 391 (2001).

In light of the policy against deciding constitutional issues unnecessarily, we have "consistently adhered to the principle that 'an interpretation which raises doubts as to a legislative enactment's constitutionality should be avoided if the language of the act permits." *Edwards v. Corbin*, 379 Md. 278, 293–294, 841 A.2d 845, 854 (2004), quoting *Harryman v. State*, 359 Md. 492, 509, 754 A.2d 1018, 1028 (2000). Chief Judge Robert Murphy, writing for the Court in *Curran v. Price, supra*, 334 Md. at 172, 638 A.2d at 104–105, stated the principle as follows:

"If a statute is susceptible of two reasonable interpretations, one of which would involve a decision as to its constitutionality, the preferred construction is that which avoids the determination of constitutionality."

In *Yangming Marine Transport v. Revon Products*, 311 Md. 496, 536 A.2d 633 (1988), a foreign corporation operating a weekly container shipping service between East Coast ports of the United States, including Baltimore, and the Far East, challenged, under the Commerce Clause, Maryland's so-called "closed-door" statute which barred an unqualified or unregistered foreign corporation, doing business in Maryland, from maintaining a suit in any Maryland court. In holding that the statute did not bar Yangming Transport from maintaining the suit, this Court explained as follows (311 Md. at 509–510, 536 A.2d at 640):

"Because of our holding that Yangming was not doing business in Maryland within the meaning of §§ 7–202, 7–203 and 7–301 as construed by the Court, and thus Yangming did not have to qualify or register in order to maintain this suit, we do not directly reach the Commerce Clause issue

raised by Yangming. Nevertheless, it must be acknowledged that the Court's construction and applications of the Maryland statutory scheme in this and prior cases obviously are influenced by constitutional considerations. Our construction and applications are in accord with the principle that a court will, whenever reasonably possible, construe and apply a statute to avoid casting serious doubt upon its constitutionality. *See, e.g., [G.] Heileman Brewing [Co.] v. Stroh Brewery,* 308 Md. 746, 763–764, 521 A.2d 1225 (1987); *In re Criminal Investigation No. 1–162,* 307 Md. 674, 685, 516 A.2d 976, 982 (1986); *Davis v. State,* 294 Md. 370, 377, 451 A.2d 107, 111 (1982)...."

*See also, e.g., R.A. Ponte Architects, Ltd. v. Investors' Alert,* 382 Md. 689, 718, 857 A.2d 1, 18 (2004) ("[A] court will, whenever reasonably possible, construe and apply a statute to avoid casting serious doubt upon its constitutionality" (internal quotation marks omitted)); *Becker v. State,* 363 Md. 77, 91–92, 767 A.2d 816, 823 (2001) ("[I]f we were to construe [the statute] as allowing the destruction of a building without any compensation to the owner, serious questions would be presented concerning the statute's constitutionality under Article III, § 40, of the Maryland Constitution and Article 24 of the Maryland Declaration of Rights"); *Tidewater/Havre de Grace, Inc. v. Mayor of Havre de Grace,* 337 Md. 338, 352, 653 A.2d 468, 475 (1995) ("[I]t is the policy of this Court to favor an interpretation that upholds the validity of an ordinance"); *St. George Church v. Aggarwal, supra,* 326 Md. at 102, 603 A.2d at 490; *Board of Trustees v. Mayor and City Council of Baltimore City,* 317 Md. 72, 97, 562 A.2d 720, 732 (1989); *cert. denied sub. nom. Lubman v. Mayor and City Council of Baltimore City,* 493 U.S. 1093, 1093–1094, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990).

Moreover, even if the parties on appeal or in their certiorari petitions raise only constitutional issues, and the grant of certiorari encompasses only the constitutional issues, this Court will avoid deciding the constitutional issues and decide the case on a non-constitutional ground if reasonably possible. Litigants may not force the Court to decide consti-

tutional issues unnecessarily by failing to raise a non-constitutional issue which can properly dispose of the case.

For example, in *Professional Staff Nurses Assoc. v. Dimensions Health Corp.,* 346 Md. 132, 695 A.2d 158 (1997), the Court of Special Appeals held that a Maryland statute was invalid under the Supremacy Clause of the United States Constitution.[9] The unsuccessful party in the Court of Special Appeals filed in this Court a petition for a writ of certiorari, presenting only the constitutional issue under the Supremacy Clause, and this Court granted the petition without adding any issues. Nevertheless, this Court "conclude[d] that the constitutional issue should not have been reached" and affirmed the judgment of the Court of Special Appeals on a non-constitutional ground. *Professional Nurses v. Dimensions, supra,* 346 Md. at 134, 695 A.2d at 158. Judge Rodowsky for the Court explained (346 Md. at 138–139, 695 A.2d at 161):

" '[T]his Court has regularly adhered to the principle that we will not reach a constitutional issue when a case can properly be disposed of on a non-constitutional ground.' *State v. Lancaster,* 332 Md. 385, 404 n. 13, 631 A.2d 453, 463 n. 13 (1993) (citing numerous cases). The appellate policy of avoiding unnecessary decision of constitutional issues gives rise to one of 'a very limited number of circumstances [that] have been treated as "extraordinary" and thus within the exceptions to the requirement that an issue be raised in a certiorari petition, cross-petition, or order by the Court.' "

In *McCarter v. State,* 363 Md. 705, 711–712, 770 A.2d 195, 198–199 (2001), the sole issue raised in this Court by the parties was whether the accused's initial appearance in the trial court, under Maryland Rule 4–213(c), "was a 'critical stage' of the criminal case, thereby triggering McCarter's constitutional right to the assistance of counsel under the Sixth Amendment." This Court, however, did not decide the constitutional issue. Instead, we construed the Maryland Public Defender Act and certain provisions of the Maryland

---

**9.** Article VI, cl. 2, of the Constitution of the United States.

Rules as granting a statutory right to counsel at the trial court proceeding. After discussing the principle that the Court will not decide a constitutional issue when the case can properly be resolved on a non-constitutional ground, the *McCarter* opinion continued by pointing out that "[t]his principle applies even if the non-constitutional ground was not raised by any party in the case," and that it is an exception to the requirement that an issue be presented in a certiorari petition. *McCarter v. State, supra,* 363 Md. at 713, 770 A.2d at 199.

There are numerous similar opinions where this Court, declining to decide the constitutional issues presented, *sua sponte* resolved the case on non-constitutional grounds. *See, e.g., Edwards v. Corbin, supra,* 379 Md. at 287, 293–294, 841 A.2d at 850, 854–855 (In order to avoid a constitutional issue under Article XI-A of the Maryland Constitution, a county ordinance was construed to apply only in the enacting county); *Baltimore Sun v. Baltimore,* 359 Md. 653, 659–660, 755 A.2d 1130, 1133–1134 (2000) (The Court refused to decide the First Amendment question presented by the appellant, and instead resolved the case on a non-constitutional ground); *Dorsey v. State,* 356 Md. 324, 341–348, 739 A.2d 41, 50–54 (1999) (The issues raised by the parties concerned the right to a jury trial under the federal and/or state constitutions, but, instead of deciding the constitutional issues, the Court rested its decision on Maryland statutory provisions); *Dept. of Public Safety and Correctional Services v. Henderson,* 351 Md. 438, 450–453, 718 A.2d 1150, 1156–1158 (1998) (This Court, avoiding the due process and *ex post facto* issues dealt with by the lower court and the parties, based its decision on the interpretation of statutory provisions); *Curran v. Price, supra,* 334 Md. at 157–159, 171–177, 638 A.2d at 97–99, 104–107 (The lower court held that a state statute was unconstitutional under the First Amendment, and the constitutional issue was the only question presented in the certiorari petition; this Court, however, declined to decide the constitutional issue and resolved the case on statutory interpretation grounds); *Schochet v. State,* 320 Md. 714, 723–726, 580 A.2d 176, 180–181 (1990) (The only issue decided by the Court of Special Appeals and raised by

the parties in this Court concerned the constitutionality of a criminal statute as applied to a certain situation; this Court, declining to reach the constitutional issue, decided the case on the ground of statutory interpretation); *State v. Insley,* 64 Md. 28, 30–31, 20 A. 1031, 1031 (1885) ("Several constitutional questions arising under the Act of 1884, ch. 518 [regulating the taking of oysters,] have been argued before us with great zeal and ability. * * * But upon the best consideration we can give to the subject we do not think it proper for this Court to pass judgment upon the constitutionality of a State law unless such judgment is necessary for the decision of the case before it. * * * Without deciding any of the constitutional questions raised, . . . we affirm the judgment for the reason . . . that the indictment is defective [for omitting an element of the statute as interpreted by the Court]"). *See also, e.g., Pickett v. Prince George's County,* 291 Md. 648, 660–662, 436 A.2d 449, 456–457 (1981); Hillard v. State, 286 Md. 145, 150–153, 406 A.2d 415, 418–420 (1979); *State v. Raithel,* 285 Md. 478, 482–484, 404 A.2d 264, 266–267 (1979); *Commissioner of Labor and Industry v. Fitzwater,* 280 Md. 14, 16, 19–20, 371 A.2d 137, 138, 140 (1977); *City of Gaithersburg v. Montgomery County,* 271 Md. 505, 510–511, 318 A.2d 509, 512–513 (1974).

Consequently, VNA Hospice of Maryland's failure to raise the statutory interpretation question in its certiorari petition presents no impediment to this Court's resolution of the case based upon our interpretation of the statute. Under the cases, if the statutory provisions can reasonably be interpreted so that the petitioner was providing home-based hospice services in Carroll and Prince George's Counties in the year 2001, the Court is required to decide the case on that statutory interpretation ground and to avoid reaching the constitutional issues presented by the Department's construction of the statutory provision.

### V.

As discussed earlier, the first issue raised by VNA Hospice at the administrative proceedings was whether the bereavement services provided in Carroll and Prince George's

Counties during 2001 constituted the provision of "home-based hospice services" in those counties within the meaning of § 19–906(c)(2) and (3) of the Health–General Article. Those subsections state as follows:

"(2) The Secretary, in consultation with the Maryland Health Care Commission, shall specify those jurisdictions in which a general hospice is authorized to provide home-based hospice services.

"(3) A general hospice may not be licensed to provide home-based hospice services in a jurisdiction unless the general hospice or an entity acquired by the general hospice provided home-based hospice services to a patient in the jurisdiction during the 12–month period ending December 31, 2001."

The ALJ, relying on the phrase "services *to* a patient" in subsection (c)(3), held that bereavement services to the deceased's family in a county of their residence failed to qualify. The ALJ indicated that, if the subsection had said "services *for* a patient," bereavement services to the deceased's family would qualify. The ALJ's interpretation fails to consider the statute as a whole, particularly in light of the principle that, if reasonably possible, a statute should not be construed to raise substantial constitutional issues.

▮▮▮ Title 19, Subtitle 9, of the Health–General Article, entitled *"Hospice Care Facilities,"* begins with a "Definitions" section in § 19–901. The remainder of the subtitle consists of §§ 19–902 through 19–913. The word "patient" is not defined in § 19–901. While the word "patient" is used in some places in the Subtitle, the Subtitle often employs the words "dying individuals" or "individuals who have no reasonable prospect of cure...." Although the word "patient" may usually refer to a person with a physical or mental illness, it certainly could encompass a member of the dying or deceased person's family who is suffering emotionally and needs bereavement services. It is significant that *Webster's Third New International Dictionary,* at p. 1655 (1981), gives as one of the definitions of the noun "patient," "one that suffers...."

The "Definitions" section for Subtitle 9 divides "home-based hospice care programs" into two types, and defines each of these types. Section 19–901 provides in subsections (d) through (g) as follows (emphasis added):

"(d) *General hospice care program.*—'General hospice care program' means a coordinated, interdisciplinary program of hospice care services for meeting the special physical, psychological, spiritual, and social needs of dying individuals *and their families,* by providing palliative and supportive medical, nursing, and other health services through home or inpatient care during the illness and bereavement:

(1) To individuals who have no reasonable prospect of cure as estimated by a physician; and

*(2) To the families of those individuals.*

(e) *General license.*—'General license' means a license issued by the Secretary to operate a general hospice care program.

(f) *Limited hospice care program.*—'Limited hospice care program' means a coordinated, interdisciplinary program of hospice care services for meeting the special physical, psychological, spiritual, and social needs of dying individuals *and their families,* by providing palliative and supportive nonskilled services through a home-based hospice care program during illness and bereavement:

(1) To individuals who have no reasonable prospect of cure as estimated by a physician; and

*(2) To the families of those individuals.*

(g) *Limited license.*—'Limited license' means a license issued by the Secretary to operate a limited hospice care program."

It is significant that the definitions of both types of home-based hospice care programs expressly include "bereavement" services "[t]o the families" of "individuals who have no reasonable prospect of cure...."

Section 19–902 of Subtitle 9 specifies the "purposes" of the Subtitle, and it draws no distinction between services to dying

individuals and services to other "individuals who want a supportive environment." [10]   In addition, the Title of Ch. 404 of the Acts of 2003 draws no distinction between services to dying individuals and services to their families.   Furthermore, the Title does not use the word "patient."

Section 19–903 authorizes the Secretary of Health and Mental Hygiene to adopt regulations for the operation of hospice care programs, and it imposes numerous "requirements" for such regulations.   Subsection (b)(3) of § 19–903 states in relevant part as follows:

"(3) The regulations for a home-based hospice care program shall require:

(i) The medical director to be a physician licensed to practice medicine in this State;

(ii) The provision of bereavement services;

(iii) The provision of services to meet the spiritual or social needs of dying individuals and their families...."

Again, the statute makes no distinction between providing services to dying individuals and providing services to their families.

As numerous provisions of Subtitle 9 demonstrate, the furnishing of bereavement services to families of dying individuals is clearly an integral part of both types of home-based hospice care programs.   Section 19–906(c)(2) states that the Secretary "shall specify those jurisdictions in which a general hospice is authorized to provide home-based hospice services," and § 19–901 states that a "general" hospice program includes bereavement services to the deceased's family.   An interpretation of § 19–906(c)(3), which excludes bereavement services to a family, based upon a difference in phraseology between "to a

---

**10.**   Section 19–902 states as follows:

" § **19–902.   Statement of purpose.**

The purposes of this subtitle are:

(1) To simplify and clarify the laws that govern the use of a hospice care program by individuals who want a supportive environment;

(2) To encourage the establishment of hospice care programs;   and

(3) To ensure the quality of these hospice care programs."

patient" and "for a patient," seems unreasonable. This is particularly true in light of the substantial constitutional issues presented under the ALJ's and Department's interpretation of the statute.

We hold, therefore, that the petitioner was performing home-based hospice services in Carroll and Prince George's Counties during 2001. Consequently, we do not decide any of the constitutional issues raised. We shall direct an affirmance of the Circuit Court's judgment, although on a different ground than that relied upon by the Circuit Court.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.*